# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Land*, 2011 IL App (1st) 101048

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JENELL LAND, Defendant-Appellant. |
| District & No. | First District,  Sixth Division<br>Docket No. 1–10–1048 |
| Filed | June 24, 2011 |
| Rehearing denied | July 29, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated cruelty to a companion animal was upheld where the trial court's failure to give an instruction on the State's burden of proving specific intent to injure the dog did not rise to the level of plain error. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09–CR–3945; the Hon. Thomas P. Fecarotta, Jr., Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Benjamin Wimmer, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justice Cahill concurred in the judgment and opinion. |
| | Presiding Justice Garcia specially concurred, with opinion |

## OPINION

¶ 1    Defendant Jenell Land was found guilty by a jury of aggravated cruelty to a companion animal, a Class 4 felony. 510 ILCS 70/3.02 (West 2006). After the trial court denied her motion for a new trial, defendant was sentenced to 30 months' probation.

¶ 2    On this appeal, defendant claims that the trial court erred: (1) when it failed to instruct the jury that the State had to prove a specific intent by defendant to injure her dog; (2) when it responded to a jury note by stating that whether defendant intentionally committed an act that caused her dog to suffer was a question of fact for the jury to decide; (3) when it found that defendant received her *Miranda* warnings even though she was not paying attention during the officer's reading of them; (4) when it permitted the State during closing argument to refer to defendant's use of profanity in her dealings with the police; and (5) when it assessed certain fines and fees.

¶ 3    For the following reasons, we affirm defendant's conviction and vacate the two charges which defendant disputes on appeal.

¶ 4                                              BACKGROUND

¶ 5    The following facts are not in dispute. At trial, defendant admitted that she and her boyfriend purchased a heavy industrial tow chain to use as a collar for their pitbull dog. Defendant claimed that they did this because the dog had broken free from other collars, and they wanted to keep him from running away. On July 28, 2008, after receiving a citizen's complaint about a dog being left outside in hot weather without water or shelter, the investigating officer observed the chain wrapped around the dog's neck and instructed defendant that a tow chain was not a proper collar for a dog and that she had to change it. On November 30, 2008, a veterinarian euthanized the dog after observing a large gaping hole in the dog's neck and a tow chain wrapped around the dog's neck, with the chain embedded

in the neck and coming through the hole. During the defense's opening statement at trial, defendant's sole defense was that her act was stupid but not criminal.

¶ 6    A key factual issue at trial concerned the length of time that the chain had been continuously on the dog. The veterinarian testified that it would take approximately a week for the chain to break through the skin to expose the muscle and then an additional five to seven weeks for the chain to become as embedded in the neck as it was. By contrast, defendant testified that, a week prior to November 30, the chain had been off the dog and his neck had no visible injury.

## I. Pretrial Proceedings

¶ 7

¶ 8    On January 26, 2009, defendant was arrested for aggravated cruelty to a companion animal. On February 26, 2009, she was indicted for the same offense. The indictment charged:

> "[O]n or about July 16, 2008[,] CONTINUING THROUGH NOVEMBER 30, 2008[,] at and within the County of Cook[,] JENELL LAND committed the offense of AGGRAVATED CRUELTY TO ANIMAL [*sic*] in that SHE INTENTIONALLY COMMITTED AN ACT THAT CAUSED SERIOUS INJURY OF A COMPANION ANIMAL, A PIT BULL, BY PLACING A TOWING CHAIN AROUND IT'S NECK ***."

¶ 9    On April 26, 2009, defendant filed a motion to suppress statements and a separate motion to quash arrest and suppress evidence. Defendant moved to suppress her statements to the police on the ground that she was not informed of her *Miranda* rights after her arrest. She also claimed that the interrogation continued after she elected to remain silent "and/or" elected to consult with an attorney prior to further questioning. Defendant's motion to quash arrest and suppress evidence claimed that the police lacked either a warrant or probable cause when they arrested her on November 30, 2008. After an evidentiary hearing, both pretrial motions were denied.

## II. Pretrial Suppression Hearing

¶ 10

¶ 11    Since one of defendant's claims on appeal concerns the pretrial suppression motion, the facts of the hearing are presented in detail.

¶ 12    At the pretrial suppression hearing held on May 20, 2009, the trial court heard first the motion to quash the arrest.

¶ 13    Defendant testified that she lived with her grandparents on Pacific Avenue, in Hoffman Estates, and that she was living at the Pacific Avenue address on November 30, 2008. However, on November 30, at approximately 9 p.m., she was with her children and their father at his residence on Briar Hill Drive in Schaumburg, and she had stayed there the night before. At approximately 9 p.m. police officers knocked on the door and she answered it. She then stepped outside and stood on the porch.. Defendant testified that a male officer said " 'You've been a naughty girly, and you know what you've done wrong.' " The two officers, a male and a female, then dragged defendant to a police vehicle and handcuffed her. They

transported her to the Schaumburg police department, where officers asked her questions and she made statements. Defendant testified that she was not shown a warrant for her arrest.

¶ 14 The State then called Dennis Schmitt, a police officer with the Schaumburg police department. Schmitt testified that, on November 30, he was accompanied by fellow officer Brian Trumf, whom Schmitt was training. Schmitt received information from a community service officer that an animal was brought into an animal hospital with a chain embedded in its neck. That evening, they spoke to Karen Davies, the treating veterinarian technician, at her residence, and showed her a photographic array. The array included a photograph of defendant, taken prior to her arrest in this case. Davies identified defendant as one of the individuals who brought the dog to the animal hospital claiming that it was hers.

¶ 15 Schmitt testified that, after the identification, he went to the address that had been supplied to the veterinarian's office. The address was on Briar Hill Drive and he went there with Officers Brian Trumf and Kendra Ziebell and community service officer Max Marcus. After Schmitt knocked on the door, defendant opened it and said "[h]old on" and then closed the door. Then Schmitt heard a female voice say "[t]hat f*** b***. Call the cops." Then defendant exited the house, closed the door behind her and stood on the walkway next to the garage. Then she made a remark to the effect that she had not done anything and the dog was not hers. At that time, defendant was placed under arrest and transported to the police station. Schmitt denied that any of the police officers dragged defendant to the police vehicle.

¶ 16 The trial court denied the motion to quash the arrest, finding that the police had probable cause to arrest based on the veterinarian's identification and the fact that the dog had an industrial chain embedded in its neck. The trial court also observed that defendant, by her own testimony, was arrested outside and not at her own home.

¶ 17 For the motion to suppress statements, the defense recalled defendant as a witness. Defendant testified that, on the evening of November 30, 2008, between 9 and 10 p.m., she was brought in handcuffs to the Schaumburg police department. It took approximately five minutes to travel to the police station. In the station, she was taken to a processing center, where police officers questioned her. Prior to the questioning, she was not informed of her *Miranda* rights. Four police officers were present, including Schmitt and a female officer.

¶ 18 The State called Kendra Ziebell, a Schaumburg police officer, who testified as follows. On November 30, 2008, Ziebell went to Briar Hill Drive with Officer Schmitt. When defendant stepped out of the residence, she was yelling and combative. Before the officers advised her why they were there, defendant started yelling that the dog was not even hers and that "b*** called the cops." Then Officer Schmitt placed defendant under arrest and advised her of her *Miranda* rights. When Officer Schmitt asked her if she understood her rights, she replied that he was "a b*** a*** motherf***." After being transported to the police station, defendant was placed in an open area of the booking room and handcuffed to a long bench. Approximately 20 to 25 minutes passed between defendant's initial arrest and the interview at the police station. Defendant never stated that she did not want to talk to the officers.

¶ 19 On cross-examination, Ziebell testified that defendant was not asked to sign a waiver of her *Miranda* rights. Ziebell wrote a report, but she did not indicate in the report that defendant received her *Miranda* rights because Ziebell was not the one who administered

them.

¶ 20    In closing, defense counsel argued that his "client has credibly indicated that she was never read her *Miranda* rights." In addition to his client's testimony, defense counsel observed that there was no signed waiver of rights and no indication in a written report that the rights were read. After hearing argument from both sides, the trial court found credible the testimony of the two police officers that the *Miranda* rights were administered.

¶ 21                                III. State's Evidence at Trial

¶ 22    Since we must later analyze whether the evidence on the issue of specific intent was closely balanced, and since defendant testified and denied intent, we must present in detail a description of the circumstantial evidence which may shed light on defendant's denial.

¶ 23    During opening statements, defense counsel conceded that defendant had placed a tow chain around the dog's neck and that this was "a really dumb thing to do." He argued that she did this because the dog ran away a lot and "[s]he didn't want her dog to run away." Her defense was that this was "a stupid idea but it was not a criminal act."

¶ 24    The State's first witness was Max Marcus, a community service officer with the Village of Schaumburg. His main duties involved animal control, and he had been employed in this position for 18 1/2 years. He was on duty during the evening of November 30, 2008, when he received an assignment to investigate an animal cruelty complaint from the Golf Road Animal Hospital. At the hospital, he spoke with Dr. Christina McCratic, who showed him the body of a dog who had been euthanized. The dog was a pit bull with a large tow chain around its neck and a large gaping hole in its neck. After reviewing the related paperwork, Marcus recognized the Briar Hill address as an address that he had visited in July 2008.

¶ 25    Marcus testified that, in July 2008, he was investigating a citizen's complaint of animal cruelty, namely, that a dog was being left outside during severely hot weather with no food or shelter. When he first went to the location, he did not observe the dog. However, when he returned later that same day, he observed a pit bull tied to a swing set. After he knocked on the front door, defendant exited the residence and he informed her of the cruelty complaint. They then went to the backyard and he observed that the water dishes were tipped over. Defendant explained that she had just returned home and that the dog must have tipped over the dishes.

¶ 26    Marcus testified that he advised defendant that there had been a complaint of no shelter for the dog. Defendant responded that there was a playhouse where the dog could reside. However, Marcus observed that, since the leash was tied around the swing set, the dog could not reach the shelter. Defendant then responded that there was a large tree that provided shade in the afternoon.

¶ 27    Marcus testified that he also observed that there was a large tow chain wrapped around the dog's neck as a collar. Defendant stated that the chain was the only thing that prevented her dog from becoming loose and that the dog had become loose before. Marcus told her that a tow chain was not a proper collar for a dog, that she had to change that, and that he would be back in another day to check on it. Marcus observed that the dog appeared healthy, and he did not issue any civil citations at that time. Later in July, Marcus returned two or three

times. However, he observed no dog outside and found no one at home.

¶ 28   Turning back to November 2008, Marcus testified that he recognized the euthanized dog in the animal hospital as the same dog that he had observed in July 2008 at defendant's house. The doctor and the animal technician provided Marcus with a description of the person who had brought the dog to the animal hospital and their description reminded Marcus of defendant. Marcus then returned to the police station to obtain a camera in order to take photographs of the euthanized dog.

¶ 29   The four photographs which Marcus took were admitted into evidence.[1] The photographs depicted a tow chain wrapped around the dog's neck, and a big gaping hole in the dog's neck, and the chain coming through the hole. Marcus testified that it appeared to him as though the chain had grown through the dog's neck.

¶ 30   The State's next witness was Deborah Diamond, who had been an animal control police officer for the Schaumburg police department since 2001. Prior to 2001, she had served as a community service officer since 1986. She was on duty on August 29, 2008, when she received an assignment at 1 p.m. concerning a stray dog that was being held at an address at Brendon Street. When she arrived, she did not observe any form of identification on the dog. She also performed a scan for a microchip that proved negative. Diamond then transported the dog to the impoundment facility, which is at the Golf Road Animal Hospital. After a dog has been impounded, the owner may claim it by identifying it at the hospital and then proceeding to the police station to pick up any citations that have been issued. Before release, the dog is implanted with a microchip for identification.

¶ 31   Diamond testified that Emangie Tripp of a Briar Hill address later came to the police station to claim the dog. At the time, Diamond did not observe any evidence of injury. Diamond testified that the Briar Hill address is approximately a block from where she had picked up the stray dog. Diamond issued three citations to Tripp when he came to claim the dog.

¶ 32   Diamond further testified that, on December 1, 2008, she went to Golf Road Animal Hospital to retrieve the chain that had been removed from a pit bull the day before. Diamond testified that the chain was a "heavy, industrial two type chain" with links that were approximately two inches, and that it weighed 3.4 pounds. Photographs of the chain taken by Diamond and the chain itself were then introduced into evidence.

¶ 33   The State's next witness was Dennis Schmitt, a Schaumburg police officer. Schmitt testified that he was on duty as a patrol officer on November 30, 2008, when he received an assignment at 7:30 p.m. to investigate an animal cruelty complaint. After receiving information from Max Marcus, a community service officer, Schmitt prepared a photographic array, which included a photograph of defendant, plus the photographs of three other individuals. Schmitt then went to the residence of Karen Davis, who was employed at the Golf Road Animal Hospital. After showing Davis the photographic array, Schmitt, who was in uniform, proceeded in a police squad vehicle to the Briar Hill address, accompanied by Officers Trumf, Ziebell and Marcus.

---

[1]There is no issue on appeal regarding the admission of any photographs.

¶ 34    Schmitt testified that he had previously been at this address on April 28, 2008, to investigate a complaint about a barking dog. On April 28, Schmitt observed a barking dog in the backyard chained to a swing set. Schmitt could not recall the type of chain. In response to Schmitt's knock on the front door, defendant answered it. After Schmitt told her to bring the dog inside, Schmitt observed her doing so.

¶ 35    Turning back to November 30, 2008, Schmitt testified that, after arriving at the Briar Hill address, he stood on the front porch and knocked on the front door. Defendant answered the door and said "hold on" to the officers. Then she walked away from the door and said "[t]hat f*** b***. Call the cops." Then defendant threw open the door, walked out, slammed the door, and stepped off the porch. Defendant stated, "[t]his is f*** bullsh***. That dog ain't even mine." Then Schmitt placed under her arrest and read her *Miranda* rights. Defendant responded to the reading of her rights by saying "b*** a*** motherf***." Defendant kept screaming obscenities. The officers then escorted defendant to the squad vehicle.

¶ 36    Schmitt testified that, while defendant was sitting in the back of the squad vehicle, she stated that she "didn't mean to have it around the dog's neck to be mean or nothing." The vehicle arrived at the police station in a few minutes, and the officers placed defendant in a secured holding facility, where she was handcuffed to a bench. Schmitt testified that he tried to have a conversation with defendant, but she responded with a stream of obscenities.

¶ 37    The State's next witness was Kendra Ziebell, a police patrol officer with the Schaumburg police department. Ziebell testified that, on November 30, 2008, she accompanied Officer Schmitt and other police officers to the Briar Hill address. After defendant came to the door, she said "hold on." and then she walked back inside and said "[t]hat b***, call the cops." Defendant then stepped out, closed the door and stepped off the front porch. Defendant stated "I didn't f*** do nothing. That dog ain't even mine." Ziebell then observed Schmitt place defendant under arrest and advise defendant of her *Miranda* rights. Officer Schmitt transported defendant to the police station, and Ziebell followed in a separate vehicle. At the police station, defendant was handcuffed to a bench, and she was screaming and yelling obscenities. Eventually, Ziebell was able to calm her down and have a conversation.

¶ 38    Ziebell testifed that defendant stated that she purchased the dog three years ago to be her family dog. Defendant stated that, at that time, she was the only owner of the dog, who was named Carmello. Defendant stated that, at that time, she lived in Hanover Park, but she lost her house there, and she had to move in with her grandparents in Hoffman Estates. Defendant stated that she then gave the dog to her children's father, who resided at the Briar Hill address. Defendant stated that, although she did not live at the Briar Hill address full time, she stayed there several nights a week and she always saw the dog. Defendant stated that the dog started running away from the house and that the children's father purchased an industrial-strength chain at Home Depot to put around the dog's neck. Defendant stated that they tied the dog to a stake in the backyard.

¶ 39    Ziebell testified that defendant stated that she did not even notice the hole in the dog's neck, until her son brought it to her attention on November 29. Defendant stated that she then reprimanded her son by saying "[h]ow did you not see this? This is bogus. You sleep with the d*** dog." When Ziebell asked defendant if she knew how the injury occurred, defendant

replied that her son was responsible for taking the dog outside and that he may have accidentally tightened the chain. Then defendant stated that the neighbors may have come over the fence and tightened it. Ziebell testified that, during this conversation, defendant referred to the dog as "my dog" several times.

¶ 40       Ziebell testified that defendant said that, although she was around the dog all the time, she never saw the hole until her son pointed it out. Defendant said that she noticed on November 29 that the dog was becoming emaciated and she did not understand why. Defendant stated that, when she saw the hole, she brought the dog to the animal hospital; however, she gave the technician a fake name because she was scared. Defendant stated that the hospital wanted $1,000 to save the "d*** dog," and she cannot even pay her water bill. Defendant stated that, for collateral for the surgery, she offered her vehicle title, $500 and a flute.

¶ 41       The State then read a stipulation entered by the parties which stated that Carmello's microchip number was registered on August 29, 2008, to "Emagie or Jenell Trip at [the] Briar Hill [address], Schaumburg, Illinois."

¶ 42       The State's next witness was Dr. Christina McCratic, an emergency veterinarian at the Golf Road Animal Hospital. McCratic has been an emergency veterinarian for 15 years and had been employed at the Golf Road Animal Hospital for 10 years. The court accepted the witness as an expert in veterinary medicine, without objection.

¶ 43       McCratic testified that she was working at the Golf Road Animal Hospital on November 30, 2008, at 3:45 p.m. when she was asked to examine a dog named Carmello. As McCratic opened the door to the examination room, she could smell a strong odor of decaying, rotten flesh. McCratic explained that a dog's body temperature is normally 102 degrees, so that if a part of the dog is decaying or rotting, it will give off a strong odor. McCratic said that it was "comparable to a 102 day in the summer, walking by a restaurant dumpster, where you smell that decaying food in there." From the smell alone, McCratic knew that there was a large infection. The examination room contained the pit bull, as well as defendant, a young black man, and an older Caucasian man. Defendant stated that there was a cut on her dog's neck and she wanted Dr. McCratic to remove the chain.

¶ 44       McCratic testified that she asked how long the cut had been there, and defendant replied that it had just happened. McCratic responded that a cut like that does not just happen and that the chain had been on for a long time based on the amount of decay and discharge shown and the condition of the animal. At that point, defendant volunteered that the dog belonged to her 12-year-old son. McCratic replied that the dog cannot legally be owned by a minor, so the dog belonged to defendant. Defendant did not respond.

¶ 45       McCratic testified that she began her visual examination of the dog as soon as she entered the room. The dog could not lift his head. McCratic explained that the condition is called "ventroflexin" and the doctor demonstrated the condition by bringing her chin down toward her chest. McCratic further testified that the dog was very thin, with all his ribs sticking out and his hip bones protruding. The dog was standing and not moving, but he was trying to wag his tail.

¶ 46       Regarding the dog's neck, McCratic observed that the chain links had cut through the

skin down to the muscle, and the muscle was exposed. She observed a very thick, yellow-green discharge or pus, which is associated with an extremely infected wound. The pus was the consistency of peanut butter or honey, and it was located all the way around his neck, coating the chain. The discharge would have transferred to anything it touched, because it was thick and sticky. There was also a lot of blood spattering on the chain which indicated that the muscle had been bleeding.

¶ 47    McCratic testified that there was a large hole in the neck, with a lot of discharge, and exposed muscle, and that the links were embedded underneath the skin. It was not possible to lift the chain off the dog's neck. McCratic stated that touching the chain without painkiller or anesthesia would have been cruel. McCratic concluded that the dog's injury was life-threatening.

¶ 48    McCratic testified that a large section of chain looped around the dog's neck, with two separate pieces of chain extending down about five links. The chain was connected under the ventrum of the neck and into the skin. McCratic explained that the chain was too heavy to be a dog collar. Most collars weigh only three or four ounces. Even the heavy choke collars sold in pet stores weigh only ounces. McCratic explained that, by comparison, this chain weighed over three pounds, and thus would cause damage to the tissues underneath it. McCratic stated that even bolt cutters would not have been enough to remove this chain, because it was too heavy.

¶ 49    Explaining the treatment options to defendant, McCratic stated that the chain would have to be surgically removed. First, the dog would have to be assessed to determine if he was a candidate for anesthesia. If he could be anesthetized, then she would have to surgically dissect each link to loosen the skin that had grown over it. Then, due to the extensive necrosis of the skin, the dog would need extensive treatment for months to grow the tissue back without infection. The only other option was humane euthanasia because the dog was ill and in a lot of pain. McCratic then exited the room to allow defendant time to consider the options. McCratic was later informed that defendant had elected to euthanize Carmello.

¶ 50    McCratic testified that, before euthanizing Carmello, she offered him a can of dog food which that he ate ravenously. Observing how hungry he was, she offered him two more cans of food which he consumed quickly. After Carmello was euthanized, McCratic lifted the chain away from his neck, and she heard the ripping and popping of tissue, as her action broke the scar tissue that had grown over the chain. The chain had grown so far into the neck that she concluded she would not be able to remove the chain without surgically dissecting the chain from the neck. Based on the extent and nature of the injury, McCratic called the police. Then she began surgically cutting through the skin and muscle to determine how many layers of tissue the chain had gone through. She discovered that the chain links were millimeters away from the trachea. In addition, the jugular vein had grown and was coming through a hole in one of the chain links.

¶ 51    McCratic explained to the jury how this injury occurred. When an item is placed too tightly on skin, the pressure cuts off the blood supply and the area dies and becomes what is called "necrotic tissue." Then the skin parts to reveal the next layer, which is muscle. The tightness will also cause the muscle tissue to lose blood supply and die. The chain will keep

cutting through layers of tissue as each layer dies from lack of blood supply. Meanwhile, the body tries to cover the area to create a barrier to prevent bacteria from entering. The covering over the necrotic or dead tissue is called "granulation tissue." The blood vessel will then seek new routes of blood to supply the granulation tissue, which is how the jugular vein began growing through the chain link itself. Carmello's neck was literally growing around the chain.

¶ 52 Based on her prior experience, McCratic estimated the amount of time it would have taken an injury to develop. First, it would have taken approximately a week for the chain to break through the skin to expose the muscle. Then, it would then have taken approximately five to seven weeks for the granulation tissue to have grown to the extent that it had, namely, with additional skin on top and some hair starting to grow. It would have taken a minimum of a month and a half for this injury to develop.

¶ 53 McCratic identified a couple of photographs of the dog which were taken after he was euthanized and which were introduced into evidence.

¶ 54 On cross-examination, McCratic testified that the names on the hospital's bill included Jenell Trip and Jumanja Tripp. Carmello was approximately 2 to 2 1/2 years old, and normally, a dog of his type should have been just at the end of his growth spurt. McCratic had provided defendant with an estimate of how much treatment would have cost, but she did not recall defendant stating that she had cash with her. Defendant did not discuss with McCratic other possible forms of payment. However, McCratic was aware that defendant had decided on humane euthanasia due to a lack of funds. Defendant and her two companions stayed at the hospital for approximately an hour and a half after receiving the treatment estimate drawn up by McCratic and before electing to euthanize.

¶ 55 The State's next witness was Charles Bulson, who managed the boarding kennel at Golf Road Animal Hospital and also performed animal control functions for the Village of Schaumburg. In the morning of December 1, 2008, he was told to remove a chain from the neck of a euthanized dog. After arriving at the hospital, he removed the dead dog from the storage freezer and storage bag. After pulling the dog's head back, he observed the chain embedded in its neck. The chain was a heavy-duty, hardened-steel chain used for tying down loads on trucks. Bulson testified that he had previously worked as an iron worker and a steel fabricator. The chain was so tight on the dog that he could not fit bolt cutters on the chain to cut it. Then he reached inside the dog's neck to pull out the chain far enough to expose some of the links. However, he was still unable to cut the chain with the bolt cutters. Then he started looking for where the chain was connected, and he discovered a C-shaped link with a nut on one side. After snapping that link, he and an assistant were able to pull the chain out. Bulson identified several photographs taken of the dog after the chain was removed, and the photographs were introduced into evidence.

¶ 56                                    IV. Defense Evidence at Trial

¶ 57 The defense witnesses were a neighbor, defendant's grandfather and defendant.

¶ 58 The defense's first witness, Kelly Collins, testified that she had been defendant's neighbor for four years and that their kids played together. Collins testified that defendant's

home was on Briar Hill Drive in Schaumburg. Defendant and her children lived there, and Carmello was their dog. Collins often called the dog "Melo," in part because he was a mellow and nice dog. Collins observed defendant and defendant's boyfriend taking care of the dog.

¶ 59 Collins testified that, between July and November 2008, she visited defendant at her home at least once a week and stayed for several hours. Whenever she went over there, she also observed the dog. During these visits, Collins observed that Carmello's collar was made out of chain links, similar to the links found in a chain link fence. However, during this time, Carmello was not always wearing his collar.

¶ 60 Collins testified that, during the weekend prior to the euthanasia, she observed that Carmello appeared fine and that he did not appear any skinnier than he had been in July. She also did not observe any injury at that time. After the dog was euthanized, defendant contacted Collins and defendant seemed very upset.

¶ 61 On direct examination, when asked specifically about the weekend prior to the euthanasia, Collins volunteered that she did not "think at that point he had the collar on." On cross, when asked about the same weekend, she stated that she did not "believe" that he was wearing the chain collar. On redirect, defense counsel asked whether she "specifically" remembered whether Carmello was wearing the collar during that weekend, and she replied "no."

¶ 62 The defendant's next witness was Kenneth Land, defendant's 79-year-old grandfather, who testified that he had raised defendant. Between July and November 2008, he visited her and her three children every day at their home on Briar Hill Drive, where they lived with defendant's boyfriend, Mr. Tripp. Land testified that he "loved that dog" and played with him every day. On November 30, 2008, his daughter called him and he came over. Land observed that Carmello's chain had become "embedded in the neck." However, there was no bleeding. Land drove Tripp, defendant and Carmello to Golf Road Animal Hospital. They were at the hospital for approximately 2 1/2 hours, and Land heard the doctor describe their options. Land, Tripp and defendant were all crying at the thought of putting the dog to sleep. However, the hospital wanted $1,000 up front for treatment, and they lacked the funds.

¶ 63 On cross-examination, Land testified that, when he came to visit, the dog could be inside or outside. If Carmello was outside, it was only for an hour or two. Then Carmello would be chained to the swingset with the tow chain. The dog was his grandson's responsibility. Land testified that he never saw anyone place the chain on the dog's neck, but that the dog did not wear the chain in the house. A couple of days prior to the trip to the hospital, Land did not observe anything wrong with the dog. During the automobile ride to the hospital, Land did not smell anything unusual.

¶ 64 The defense's third and last witness was the defendant, who testified that she owned the dog with Jumanja Tripp, who is the father of three of her four children. Contrary to both her neighbor and her grandfather, defendant testified that, between July and November 2008, she did not reside at the Briar Hill address. Defendant testified that she lived at the Pacific

Avenue address,[2] while Tripp and her children lived at the Briar Hill address. However, she visited the Briar Hill address three or four times a week. Her oldest son, 12-year-old Brandon Tripp, was responsible for taking care of Carmello, the dog, who stayed at the Briar Hill address.

¶ 65    Defendant testified that she and Tripp purchased Carmello in 2006. They tried using leather collars, vinyl collars and choker collars; however, the dog broke free. Thus, Tripp and defendant went to Home Depot at some time in 2008 to purchase the tow chain which Carmello was wearing on November 30, 2008. Usually, the dog wore the chain only when he was outside.

¶ 66    Defendant testified that, on November 30, 2008, Brandon and Tripp brought to her attention the fact that they could not remove the chain. Defendant called her grandfather, who tried unsuccessfully to remove the chain. It was approximately 3 p.m. on a Sunday, so they decided to bring Carmello to the Golf Road Animal Hospital, because it was open on Sundays. Defendant called the hospital and gave her name as Jenell Tripp. Then she, Tripp and her grandfather transported Carmello in her father's jeep, with Carmello traveling in the flatbed part of the vehicle. Defendant testified that she did not look at the dog's collar until they were at the hospital, because it "hurt" her to look at the dog.

¶ 67    Defendant testified that, when she looked at the chain, she observed that it "went through the dog's neck." However, she did not observe any blood. At first, the veterinarian technician explained that this type of injury would require extensive surgery but there was no guarantee that the dog would live. Defendant testified that, to pay for the surgery, she offered the technician $540 in cash, a vehicle title, a flute, and a collection of Hummels. The technician said that would not be acceptable. Defendant testified that she then asked her grandfather to write a postdated check, but he refused to do so because of insufficient funds. Defendant, Land and Tripp discussed their options for about a half-hour, and then ultimately defendant made the decision to have the dog put to sleep, because she did not have the money to pay for the surgery. They were told that the cost for the surgery would be $1,400 or $1,500, and then $200 or $300 for every-other-week visits.

¶ 68    Defendant testified that she had occasionally placed the collar on the dog and that the last time that she personally placed the collar on the dog was approximately three or four weeks prior to November 30. The last time the collar was taken off the dog by anyone, prior to November 30, was approximately a week before. Defendant had occasionally observed the dog slip out of the collar.

¶ 69    On cross-examination, defendant testified that she had seen the dog without the collar around his neck one week before November 30. Defendant testified that, at that time, he had no injury on his neck. The dog slept in her son's bed every night. When she changed the sheets on her son's bed, she did not observe any blood, pus or discharge of any kind. Defendant admitted that, when the police came to the door on November 30, she stated that "f*** b***" called the cops. When shown photographs of her dog taken on November 30,

_____

[2]At the suppression hearing, defendant testified that the Pacific Avenue address was her grandfather's address.

she admitted that the photographs depicted a big hole in the side of his neck, as well as blood and a yellow substance.

¶ 70                                    V. Jury Instructions

¶ 71    The Illinois Pattern Jury Instructions (IPI) manual does not contain an instruction for the charged offense. With the agreement of both parties, the trial court provided the following instruction, which tracked the language of the statute:

> "To sustain the charge of aggravated cruelty to an animal, the State must prove the following proposition:
>
> That the defendant intentionally committed an act that caused a companion animal to suffer serious injury or death."

Although the trial court did not break the offense down into elements, the trial court did specifically instruct the jury:

> "Aggravated cruelty to an animal does not include euthanasia of a companion animal through recognized methods approved by the Department of Agriculture."

The trial court was concerned that the subsequent euthanasia by the veterinarian might confuse the jury, and the above instruction was intended to remove that confusion.

¶ 72                                       VI. Jury Notes

¶ 73    One of the claims on appeal concerns the second of two notes submitted by the jury during its deliberations.

¶ 74    The first jury note asked: "May we review the transcript of defendant's testimony?" The trial judge provided the following handwritten reply:

> "There is no transcript of the defendant's testimony available. You have all the evidence in this case, please continue to deliberate.
>
> Judge Fecarotta 4:32 p.m."

There is no issue on appeal regarding this first note.

¶ 75    The jury submitted a second note that stated:

> "Is the charge of aggravated cruelty to an animal which is intentionally committing an act ...
>
> Is the intentional act she committed putting the chain on the dog's neck or leaving the chain on the dog?" (Ellipsis in original.)

In reply, the trial judge provided the following handwritten note:

> "Whether the defendant intentionally committed an act that caused a companion animal to suffer serious injury or death is a question of fact for the jury to decide. You have all the evidence in the case and the instructions on the law that applies, please continue to deliberate.
>
> Judge Fecarotta 5:32 p.m."

¶ 76    Prior to giving this response, the trial court discussed it with the State and the defense,

and the court had the following discussion with defense counsel:

> "THE COURT: *** If you have another suggestion–I mean she [the author of the note] wants me to define whether or not the defendant committed this act. That's not a question for the judge to decide. That's a question of fact for them to decide.
>
> DEFENSE COUNSEL: They have all the facts. They actually have People's instruction number 11.[3] I believe from these two, she should be able to discern what it is.
>
> THE COURT: I still have to answer the question and do the best I can in directing the jury. So I believe that that's the proper thing to do. So that'll be my answer.
>
> DEFENSE COUNSEL: We agree."

The trial judge then read aloud the exact written response that he intended to give, and he asked defense counsel again "[a]ny objection?" To which defense counsel responded no. Later that same day, the jury returned with a guilty verdict.

¶ 77                              VII. Postrial Proceedings

¶ 78      On October 15, 2009, a jury returned a verdict finding defendant guilty of aggravated cruelty to a companion animal. In a posttrial motion for a new trial, defendant claimed (1) that the State failed to prove beyond a reasonable doubt that defendant was the last person who placed the chain around the dog's neck; (2) that the trial court erred by denying defendant's motion to suppress her statements to police; and (3) that the governing statute was unconstitutionally vague.

¶ 79      On December 15, 2009, the trial court denied the posttrial motion, and sentenced defendant to 30 months' probation and assessed fines and fees totaling $610. The conditions of her probation included prohibitions against any possession or contact with pets or animals and any consumption of any alcohol, marijuana or other controlled substances.

¶ 80      On January 12, 2010, a petition to revoke probation was filed, alleging that defendant had tested positive for marijuana use. On February 26, 2010, a supplemental petition stated that additional violations included: testing positive again for use of marijuana, refusing to answer interview questions or to sign the probation supervision agreement, and failing to make payment toward probation fees. On April 9, 2010, a second supplemental petition stated that defendant had again tested positive for marijuana use. On April 9, 2010, the trial court ordered defendant remanded to the custody of the sheriff's department for 90 days.

¶ 81      On April 12, 2010, the State Appellate Defender filed a notice of appeal on defendant's behalf, and this appeal followed.

¶ 82                                    ANALYSIS

---

[3]"People's instruction number 11" is the non-IPI instruction which tracked the statute and which is provided in full in the prior section of this opinion.

¶ 83    Defendant was convicted of aggravated cruelty to a companion animal. Aggravated cruelty is defined by statute as "intentionally commit[ting] an act that causes a companion animal to suffer serious injury or death." 510 ILCS 70/3.02 (West 2006). However, the statute specifies that aggravated cruelty does not include euthanasia of a companion animal by a veterinarian. 510 ILCS 70/3.02 (West 2006).

¶ 84    On this appeal, defendant claims that the trial court erred: (1) when it failed to instruct the jury that the State had to prove a specific intent by defendant to injure her dog; (2) when it responded to a jury note by stating that whether defendant intentionally committed an act that caused her dog to suffer was a question of fact for the jury to decide; (3) when it found that defendant received her *Miranda* warnings even though she was not paying attention during the officer's reading of them; (4) when it permitted the State during closing argument to refer to defendant's use of profanity in her dealings with the police; and (5) when it assessed certain fines and fees.

¶ 85    For the following reasons, we affirm defendant's conviction and vacate the two charges which defendant disputes on appeal.

¶ 86                              I. Jury Instruction
¶ 87    Defendant claims that the trial court erred by failing to instruct the jury that the State had to prove a specific intent by defendant to injure her dog.

¶ 88    In a case decided after defendant's conviction, the appellate court held that, to obtain a conviction for this offense, the State had to prove a specific intent to injure or kill the animal. *People v. Primbas*, 404 Ill. App. 3d 297, 301 (2010). See also *People v. Larson*, 379 Ill. App. 3d 642, 651 (2008) (holding that "the aggravated-cruelty-to-an-animal statute" was not void for vagueness, in part, because it required defendant's "specified intent to cause" serious injury or death to a companion animal). There is no dispute between the parties about what the *Primbas* case holds.

¶ 89    In addition, in their respective briefs to this court, the State conceded that the jury was not instructed that the State had to prove a specific intent; and the defense conceded that defendant failed to preserve this error for review. In light of defendant's forfeiture of this issue, defendant asks us to find either that the error rises to the level of plain error or that her trial counsel was ineffective for failing to preserve this issue for appeal.

¶ 90    For the reasons discussed below, we find both that the error did not rise to the level of plain error and that defendant's trial counsel was not ineffective for failing to raise the issue.

¶ 91                              A. Plain Error
¶ 92    Defendant asks this court to find plain error under both prongs of the plain error doctrine.

¶ 93    The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). When a defendant has failed to preserve an error for review, we may still review for plain error. *Piatkowski*, 225 Ill. 2d at 562-63; Ill. S. Ct. R. 615(a) ("Plain errors or defects

affecting substantial rights may be noticed although they were not brought to the attention of the trial court.").

¶ 94 The plain error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. As we mentioned above, defendant argues that both prongs of the plain error doctrine apply.

¶ 95                                        1. Not Closely Balanced

¶ 96 The error affected only one element, namely, the specific intent to kill or injure the animal; and the evidence on this element was not closely balanced.[4]

¶ 97 In its brief to this court, defendant argued: "True, few people would put a heavy tow chain around a dog's neck as a collar. But that does not mean that most would expect the chain would cause serious injury ***[.] Ms. Land's decision to use the chain as Carmello's collar could be wrong without amounting to aggravated cruelty."

¶ 98 In other words, defendant argues (1) that placing a heavy tow chain around a dog's neck was not cruel; and (2) that the jury could consider only defendant's intent in placing the tow chain around the dog's neck and not defendant's intent in leaving the heavy chain around the dog's neck for weeks.

¶ 99 With respect to defendant's act of leaving the chain on her dog, the defense brief argues that a jury "could reasonably conclude that she failed to remove the chain *** because of Land's lamentable difficulty in facing unpleasant situations." Defendant argues that even when the dog required a trip to the hospital, she did not look at his neck because "it hurt her to have to look at it."

¶ 100 "Where a defendant denies intent, as here where defendant claimed he had no intent to harm [the dog], intent may be demonstrated through circumstantial evidence." *Primbas*, 404 Ill. App. 3d at 302 (citing *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009)). For example, in *Primbas*, the court found inherently incredible defendant's testimony that he was merely firing a gun to scare away what he thought was a feral animal, when defendant walked back into the garage without determining whether the animal had been scared off or lay wounded

---

[4]The special concurrence finds that we do not need to address defendant's argument regarding the first prong of the plain error doctrine, because "[i]n the section in her main brief raising this claim, the defendant fails to cite a single case in support of this argument." *Infra* ¶ 169. Defendant cites numerous cases in support of her plain error claims; however, in subsubsection I. C. 2. where she discusses only the evidence at trial, there were no additional cites provided. We disagree that this provides a reason to disregard her claim. See also *People v. Williams*, 193 Ill. 2d 306, 348 (2000) ("we believe it would be unfair to require a defendant to assert plain error in his or her opening brief").

on the deck, where it could have continued to pose a danger. *Primbas*, 404 Ill. App. 3d at 302-03.

¶ 101    Similarly, in the case at bar, defendant's testimony was inherently incredible. Defendant's trial testimony conflicted with that of her own witnesses, namely, her grandfather and neighbor, when she claimed that she did not live at the same address as the dog. Defendant's testimony–that the chain had been on the dog for less than a week and that at that time he had no injury at all–and the veterinarian's testimony–that the injury was caused by continuous contact for at least a month and a half–could not both be true. Since the only injury presented to the jury was one caused by continuous contact, the jury had to resolve this credibility dispute against defendant in order to find her guilty of causing a serious injury. The grandfather's testimony that he never saw anyone place the chain on the dog was inherently incredible, since he also testified that he was at their home almost every day, that he saw the dog both indoors and outdoors, and that the dog did not wear the chain when indoors. In addition, defendant had to know that the chain was not a proper collar for a dog, when the animal control officer in July 2008 specifically informed her of that fact and directed her to change it.

¶ 102    The jury could have found that defendant specifically intended to cause Carmello injury, at a point in time after the chain broke through the skin and during the four to six weeks it took for the chain to become seriously embedded in the dog's neck. The veterinarian was accepted, without objection, as an expert in veterinary medicine. Since no other expert testified, her expert testimony about the progression and development of this type of injury went unrefuted.

¶ 103    For these reasons, we find that the evidence on the issue of specific intent was not closely balanced, and thus the error did not rise to the level of plain error under the first prong of the plain error doctrine.

¶ 104                                    2. Not Fundamental Error

¶ 105    We also find that the error did not rise to the level of plain error under the second prong of the plain error doctrine. Plain error occurs under the second prong, when a clear or obvious error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471.

¶ 106    In the case at bar, the Illinois Pattern Jury Instructions (IPI) does not provide a pattern instruction for this offense. As a result, the trial court, with the agreement of both parties, designed an instruction that tracked the language of the statute. The statute and the instruction both contained the word "intentionally." We cannot find that delivering an agreed-to non-IPI instruction, when no IPI instruction was available and the given instruction tracked the statute, challenged the integrity of the judicial process, and defendant has not cited us a case to the contrary. See *People v. Thompson*, 238 Ill. 2d 598, 615 (2010) (although trial court erred by failing to instruct potential jurors that defendant did not have to offer evidence, this error did not rise to the level of plain error under the second prong).

¶ 107    Defendant argues in her brief to this court that the error was elevated to the level of

fundamental or plain error when the State allegedly argued in its closing statement that it did not have to prove an intent by defendant to kill or seriously injure the dog. In support of this argument, defendant cites and quotes–in part–a passage from the State's closing statement.

¶ 108    That is simply not what the prosecutor said. The two words quoted by defendant, "no intent," are plucked out of context. What the prosecutor actually said is that the State did not have to prove an intent "to kill the dog." In this part of the State's closing statement, the prosecutor argued:

> "Let's talk about defendant's intent. The defense attorney said that she didn't intend to kill that dog. That's not the law."

The statute, as the prosecutor then immediately pointed out, refers to both "serious injury or death." Thus, we find no factual basis to support defendant's argument that the State misstated the law in its closing argument.

¶ 109    In addition, the three cases cited by defendant are distinguishable. First, in *People v. Ogunsola*, 87 Ill. 2d 216 (1981), our supreme court found plain error where the jury instruction listed the elements of the offense but omitted one. *Ogunsola*, 87 Ill. 2d at 221-22. In *Ogunsola*, the trial court instructed the jurors that, in order to find defendant guilty, they had to find two propositions true. *Ogunsola*, 87 Ill. 2d at 219. The court then listed these two propositions, prefaced by " '[f]irst' " and " '[s]econd.' " *Ogunsola*, 87 Ill. 2d at 219. Our supreme court reversed finding the instruction misleading. *Ogunsola*, 87 Ill. 2d at 223. By contrast, in the case at bar, the instruction did not purport to list or enumerate the elements of the crime. The instruction merely repeated the statutory language. Thus, there was no element that was specifically omitted, as was the case in *Ogunsola*.

¶ 110    Second, in *People v. Grant*, 101 Ill. App. 3d 43 (1981), the statute defining the offense did not itself list any required mental state. *Grant*, 101 Ill. App. 3d at 47. The required mental state was described in another statute. *Grant*, 101 Ill. App. 3d at 47-48. Thus, the instruction, which tracked only the defining statute, omitted any intent requirement and turned the crime into a strict liability crime. *Grant*, 101 Ill. App. 3d at 47-48. The appellate court found this omission to be reversible error. *Grant*, 101 Ill. App. 3d at 48. By contrast, in the case at bar, there was no danger of the jury mistaking this crime for a strict liability crime, since the word "intentionally" was in the statute defining the offense.

¶ 111    Third, *People v. Williams*, 181 Ill. 2d 297 (1998), found no plain error, even though the oral jury instructions added an extra phrase to the second degree murder instruction where, first, the oral instruction was proper; second, "defendant did not present a substantial defense–the evidence against the defendant was overwhelming"; and third, the jury had an opportunity to deliberate for an hour after receiving the corrected written instructions. *Williams*, 181 Ill. 2d at 319-20. This case is distinguishable, since the distinction between oral and written instructions has no application to the case at bar.

¶ 112    Finding the cases cited by defendant distinguishable, we adhere to our conclusion that the integrity of the judicial process was not undermined by an agreed-to non-IPI instruction, when no IPI instruction was available and the given instruction tracked the statute and stated the law.

-18-

¶ 113                          B. Not Ineffective Assistance of Counsel

¶ 114      Defendant claims that her trial counsel was ineffective for failing to raise the issue of specific intent. In Illinois, claims of ineffective assistance of counsel are governed by the rule set forth in the United States Supreme Court case of *Strickland v. Washington*, 466 U.S. 668 (1984), which was adopted by the Illinois Supreme Court in the case of *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).

¶ 115      The *Strickland* rule is a two-prong test. To prevail, a defendant must show both (1) that counsel's performance was deficient; and (2) that this deficient performance prejudiced defendant. *Petrenko*, 237 Ill. 2d at 496 (citing *Strickland*, 466 U.S. at 687). To satisfy the first prong, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms; and to satisfy the second prong, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Petrenko*, 237 Ill. 2d at 496-97 (citing *Strickland*, 466 U.S. at 694).

¶ 116      Although the *Strickland* test is a two-prong test, our analysis can proceed in any order. If a court finds that defendant was not prejudiced, it may dismiss on that basis alone, without further analysis. *Albanese*, 104 Ill. 2d at 527.

¶ 117      For the reasons already discussed above, we find that defendant was not prejudiced, since the evidence on this element was not closely balanced and thus there is not a reasonable probability that the result of the proceeding would have been different.


¶ 118                                        II. Jury Note

¶ 119      Defendant claims that the jury's note asked, in essence, whether defendant's omission in failing to remove the chain could qualify as an "act," as the offense requires. The charged offense required the State to prove that defendant intentionally committed "an act" that caused serious injury or death to a companion animal. 510 ILCS 70/3.02 (West 2006). Defendant claims that the jury could find her guilty only if the State proved that she was the last person to take the affirmative act of placing the collar on the dog's neck.

¶ 120      Claiming that an omission is not an act, defendant argues that the trial court erred by failing to respond to the jury's note with an instruction on this alleged point of law. Defendant concedes that her trial counsel did not raise this issue below and thus we may review this alleged error only for plain error. *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. Defendant also asks us to find that she received ineffective assistance of counsel due to her trial counsel's claimed failure to request such an instruction. *Petrenko*, 237 Ill. 2d at 496-97 (citing *Strickland*, 466 U.S. at 694). Generally, we review a trial court's response to a jury note, only for an abuse of discretion. *People v. Maldonado*, 402 Ill. App. 3d 411, 431 (2010).

¶ 121      Defendant's argument has no legal basis. The Illinois Criminal Code of 1961 expressly provides that an " '[a]ct' includes a failure or omission to take action." 720 ILCS 5/2–2 (West 2006). In addition, the Code provides that "a voluntary act" includes "an omission to perform a duty." 720 ILCS 5/4–1 (West 2006). If there was any doubt about the clear meaning of our statutes, our supreme court has expressly stated that "the Criminal Code has

eliminated the distinction between 'omission' and 'act.' " *People v. Caruso*, 119 Ill. 2d 376, 383 (1987). Thus, defendant's claimed distinction between an "act" and an "omission" has no legal basis in Illinois criminal law. If the trial court had instructed the jury in the way defendant suggests, it would have been error.

¶ 122　　In addition, we observe that the jury could have found defendant guilty based on her omission or on her own affirmative actions. Defendant concedes that she committed the affirmative actions of purchasing Carmello to be the family dog and purchasing a heavy tow chain to wrap around his neck. Defendant committed the affirmative action of delegating to her 12-year-old son the responsibility of periodically taking this heavy chain off the dog. This continued, even after a community service officer, whose testimony went unrefuted, testified that he specifically told defendant that the tow chain was not an appropriate collar for a dog and directed defendant to change it. As the veterinarian testified, a 12-year-old cannot be legally responsible for a dog. Thus, the jury's verdict could have been based on defendant's omissions or on her affirmative actions in delegating responsibility to and supervising her 12-year-old son, and in purchasing a heavy tow chain for the purpose of wrapping around her dog's neck and in continuing to use it, after specifically being directed not to use it as a collar.

¶ 123　　Defendant also claims on appeal that the trial court's response was error, because it permitted the jury to consider a legal theory, namely, omission, that defendant had not been permitted to discuss in closing argument. Defendant's brief to this court fails to provide any cites to the record to support this claim.

¶ 124　　Not only did defendant discuss her alleged failure to act in closing argument, but rebutting this claim was one of the principal points of her closing. Defense counsel discussed at length why the evidence was consistent with her testimony that she had first discovered any injury on her dog only hours before bringing Carmello to the hospital and that she had responded quickly and to the best of her ability.

¶ 125　　For these reasons, we reject defendant's claims (1) that an omission is not an act; (2) that the State had to prove beyond a reasonable doubt that she was the last person to place the collar on the dog's neck; and (3) that defendant was prevented from arguing against omission during closing statements. We find that the trial court did not abuse its discretion in responding to the jury's note. Finding no error, we cannot find any plain error. *People v. Hanson*, 238 Ill. 2d 74, 115 (2010) ("Finding no error, our plain-error analysis ends here.").

¶ 126　　　　　　　　　　　　　III. *Miranda* Rights

¶ 127　　Defendant claims on appeal that the trial court should have suppressed her statements on the ground that she was not paying attention when a police officer advised her of her *Miranda* rights.

¶ 128　　In her written pretrial suppression motion, defendant asserted two grounds for suppressing her statements, neither of which are raised on this appeal. First, she claimed that she was not informed of her *Miranda* rights after her arrest and prior to questioning by police officer "D. Schmitt." Second, she claimed that the questioning continued after she "had elected to remain silent and/or had elected to consult with an attorney."

¶ 129       At the ensuing pretrial hearing, the defense waived opening statement. However, in closing argument, defense counsel framed the issue as a factual question about whether defendant had been "read her *Miranda* rights." The defense framed the issue as a simple credibility dispute between defendant, who testified that she had not been read her rights, and the police officer who testified that she had. Defense counsel argued that his client had testified credibly, while the police officer's testimony was undercut by the lack of a written waiver and the lack of a note in the police report to indicate that warnings were provided.

¶ 130       After listening to counsel's argument, the trial court found, based on the evidence, that Officer Schmitt had, in fact, read defendant her *Miranda* rights. The trial court then went on to remark that "perhaps the defendant was not paying attention" and defendant "was so upset that she probably wasn't paying much attention." The trial court then stated that "[t]he law is not whether or not the defendant hears, as long as the officer takes reasonable measures to give *Miranda* warnings and there's some type of acknowledgment." Apparently finding both reasonable measures by the officers to provide warnings, as well as some acknowledgment by defendant, the trial court then denied defendant's motion to suppress.

¶ 131       On appeal, defendant does not dispute that she was read her *Miranda* rights, but rather she argues that she was too upset to pay attention to them.

¶ 132       On appeal, the State claims that, by failing to argue before the trial court that defendant was not paying attention to the *Miranda* warnings, defendant has waived this issue on appeal. If the issue was waived, we could review it only for plain error. *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. However, we do not have to decide whether the issue was waived since we find, on the record before us, that there was no error at all.

¶ 133       When reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). First, "we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence." *Johnson*, 237 Ill. 2d at 88; *People v. Bridgewater*, 235 Ill. 2d 85, 92 (2009).

¶ 134       Second, we make our " ' "own assessment of the facts in relation to the issues," ' and review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Johnson*, 237 Ill. 2d at 88-89 (quoting *People v. Cosby*, 231 Ill. 2d 262, 271 (2008), quoting *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006)); *Bridgewater*, 235 Ill. 2d at 92-93. In addition, we may affirm the trial court's ruling on any basis found in the record. *Johnson*, 237 Ill. 2d at 89.

¶ 135       First, we cannot find that the trial court's factual findings were against the manifest weight of the evidence. In the case at bar, the trial court did not definitively find that defendant was paying *no* attention. Rather, the trial court concluded that defendant "probably" was not paying "much attention." However, the trial court did find that there was an "acknowledgment" by defendant to the reading of her rights. At the pretrial hearing, Officer Ziebell testified that, when defendant was asked if she understood her rights, defendant did respond, although the response was an obscenity. At the subsequent trial, Officer Schmitt also testified that defendant responded to the reading of *Miranda* warnings with an obscenity. Thus, we cannot hold that the trial court's factual finding of an

acknowledgment was against the manifest weight of the evidence.

¶ 136    Second, we must review *de novo* the trial court's ultimate legal ruling as to whether suppression was warranted. *Johnson*, 237 Ill. 2d at 88-89. To do that, we must set forth the relevant law concerning *Miranda*.

¶ 137    When a defendant moves to suppress his or her statements based on an alleged *Miranda* violation, the State has the burden at a suppression hearing to prove, by a preponderance of the evidence, that defendant waived his or her *Miranda* rights. *Berghuis v. Thompkins*, 560 U.S. __, __, 130 S. Ct. 2250, 2261 (2010); *People v. Daniels*, 391 Ill. App. 3d 750, 780 (2009). "If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement," "[t]he prosecution must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at __, 130 S. Ct. at 2261; *Daniels*, 391 Ill. App. 3d at 780. On appeal, defendant does not dispute either that a *Miranda* warning was given or that she made an uncoerced statement. She claims only that the prosecution failed to make "the additional showing," by a preponderance of the evidence, that she understood her rights. See *Berghuis*, 560 U.S. at __, 130 S. Ct. at 2261.

¶ 138    In *Berghuis*, the United States Supreme Court found that "[t]here was more than enough evidence" in the record before it to conclude that defendant understood his *Miranda* rights, where defendant could understand and read English, where the police provided both oral and written warnings, and where defendant read aloud one of the warnings. *Berghuis*, 560 U.S. at __, 130 S. Ct. at 2261. By stressing that these facts constituted "more than enough evidence" to establish understanding, the Court indicated that these facts were *not* a minimum or baseline but were instead *above* whatever minium or baseline was required to establish understanding by a preponderance of the evidence.

¶ 139    Although our case differs from *Berghuis* in that a written warning was not provided in the case at bar, written warnings have never been required. For example, in a case decided after *Berghuis*, this court held that an oral *Miranda* warning, followed by an " 'uh huh' " by defendant, was sufficient to establish that defendant understood his right to remain silent. *People v. Polk*, 407 Ill. App. 3d 80, 94-95 (2010). See also *People v. Calhoun*, 382 Ill. App. 3d 1140, 1148 (2008) (holding that defendant understood his rights when he nodded after they were orally read).

¶ 140    In the case at bar, there is no question that defendant was read her *Miranda* rights, that she understood English, and that she made a verbal response to the question of whether she understood her *Miranda* rights. At the suppression hearing, Officer Ziebell, whom the trial court specifically found to be a credible witness, testified that Officer Schmitt advised defendant of her *Miranda* rights when she was first arrested at the Briar Hill address. Then Officer Ziebell testified, "when [Officer Schmitt] asked her if she understood, she said, 'You're a b*** a*** motherf***.' " Similarly, at trial, Officer Schmitt testified that he advised defendant of her *Miranda* rights and that he specifically asked her whether she understood those rights. He testified that she responded to his question about understanding by saying that he was a "b*** a*** motherf***."

¶ 141    If we were to hold that every defendant who is upset at being arrested or who cursed the arresting officer did not understand his or her *Miranda* rights, a valid waiver would become

a rare event. It would not surprise us to find that a lot of defendants are upset at finding themselves arrested, and a lot of defendants curse the officer who arrests them.

¶ 142    Defendant asks us to compare her situation to the case of *People v. Roy*, 49 Ill. 2d 113 (1971), where the Illinois Supreme Court held that defendant was too drunk to understand his rights. *Roy*, 49 Ill. 2d at 115 (police officer testified at suppression hearing that defendant was drunk). See also *People v. Garcia*, 165 Ill. 2d 409, 424 (1995) (affirming trial court's finding that defendant was *not* too intoxicated to waive *Miranda* rights). Similarly, in *Daniels*, this court held that a defendant lacked the mental capacity to understand her *Miranda* rights, where her IQ was less than 64 and thus in the lower one-tenth of 1% of other adults her age, and where two out of the three examining doctors found that she lacked the mental capacity to understand *Miranda* rights. *Daniels*, 391 Ill. App. 3d at 783, 786-87. But see *In re W.C.*, 167 Ill. 2d 307, 330, 335 (1995) (holding that a mentally retarded 13-year-old with an IQ of 47 or 48 could validly waive his *Miranda* rights).

¶ 143    In the case at bar, defendant states in her appellate brief that she was not drunk. In addition she has never argued, either before the trial court or before this court, that she was under the influence of drugs or that she lacked the innate mental capacity to comprehend the warnings. Instead, defendant asks us to equate her degree of emotional upset with being drunk.

¶ 144    It is hard for us to find that she was so upset as to not understand the events around her, when she immediately understood, without being told, that the veterinarian had contacted the police, and when she offered, without any prompting, statements that she hoped would exonerate her, such as "[t]hat dog ain't even mine." Thus, reviewing *de novo* the trial court's ultimate legal ruling, we find the State satisfied its burden of establishing a knowing waiver by a preponderance of the evidence.

¶ 145                              IV. Prosecutor's Closing Argument

¶ 146    Defendant claims that it was error for the trial court to allow the State in its closing argument to refer to defendant's prior use of profanity. On appeal, defendant concedes that this issue was not raised at trial, but argues for reversal on the grounds (1) that the error rose to the level of plain error, or (2) that trial counsel was ineffective for failing to object to it. Since we find no error, we need not consider defendant's claims of plain error and ineffective assistance of counsel.

¶ 147                              A. Standard of Review

¶ 148    It is not clear whether the appropriate standard of review for this issue is *de novo* or abuse of discretion. This court has previously made this same observation in both *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009), and *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008). The Second District agreed with our observation that the standard of review for closing remarks is an unsettled issue. *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

¶ 149    The confusion stems from an apparent conflict between two supreme court cases: *People*

*v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Blue*, 189 Ill. 2d 99, 128, 132 (2000). In *Wheeler*, our supreme court held: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *Wheeler*, 226 Ill. 2d at 121. However, the supreme court in *Wheeler* cited with approval *Blue*, in which the supreme court had previously applied an abuse-of-discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing argument is within the trial court's discretion, and that the trial court's decision will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 128, 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Emerson*, 189 Ill. 2d 436, 488 (2000); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court had reasoned: "Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse-of-discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

¶ 150    Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. The second and third divisions of the First District have applied an abuse-of-discretion standard, while the Third and Fourth Districts and the fifth division of the First District have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 313 (1st Dist. 1st Div. 2007) (Wolfson, J.), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (1st Dist. 3d Div. 2008) (Quinn, P.J.), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (4th Dist. 2008), *People v. Ramos*, 396 Ill. App. 3d 869, 874 (1st Dist. 5th Div. 2009) (Toomin, P.J.), and *People v. Vargas*, 409 Ill. App. 3d 790, 797-98 (2011) (Epstein, J.).

¶ 151    However, we do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard. This is the same approach that we took in both *Phillips* and *Johnson*, and the same approach taken by the Second District in its *Robinson* opinion. *Phillips*, 392 Ill. App. 3d at 275; *Johnson*, 385 Ill. App. 3d at 603; *Robinson*, 391 Ill. App. 3d at 840 ("In any event, like the *Johnson* court, we leave the resolution of this issue to another day, as our conclusion would be the same applying either standard.").

¶ 152                                    B. Substantial Prejudice

¶ 153    A State's closing will lead to reversal only if the prosecutor's remarks created "substantial prejudice." *Wheeler*, 226 Ill. 2d at 123; *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice."). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." *Wheeler*, 226 Ill. 2d at 123.

¶ 154    When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. *Wheeler*, 226 Ill. 2d at 122; *Johnson*, 208 Ill. 2d at 113; *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields ***." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 155    "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). For example, in *Glasper*, defendant argued that the prosecutor had "shifted the burden of proof to defendant" when, in response to defendant's claim of a coerced confession, the prosecutor had stated in rebuttal closing: " 'Where's the evidence of that?' " *Glasper*, 234 Ill. 2d at 212. Our supreme court held that the comment "did not shift the burden of proof to defendant," but that it merely "pointed out that no evidence existed in this case to support defendant's theory" and that it was "invited by defense counsel's argument." *Glasper*, 234 Ill. 2d at 212.

¶ 156                            C. Statements at Issue

¶ 157    At trial, Officers Schmitt and Ziebell testified to defendant's use of profanity during her arrest. Specifically, defendant stated that the veterinarian was a "f*** b***" for calling the police, and she responded to Officer Schmitt's question about whether she understood her *Miranda* rights by calling Officer Schmitt a "b*** a*** motherf***." Defendant also testified that, during her arrest, she stated that the veterinarian was a "f*** b***" for calling the police.

¶ 158    During the State's first closing argument, the prosecutor made no reference to defendant's use of profanity. The first reference during closing arguments to defendant's use of profanity was made during the defense closing. Specifically, the defense stated:

> "They arrest her at her house. You heard what the words are. She's upset. I would not have advised her to behave that way with police officers. She was upset. She behaved that way. That's not what's at issue here. ***
>
> So Ms. Land is angry when she gets arrested. She says some things that she shouldn't say. It's kind of rough in her style and her manner, but the thing you have to–the State has to prove her guilty beyond a reasonable doubt."

¶ 159    Then, two times during the State's rebuttal closing, the prosecutor quoted defendant's obscenities. First, the prosecutor stated:

> "That f*** b*** called the cops. You know now what that f*** b*** is; Dr. McCratic, a woman who has wanted to be a veterinarian since she was five years old, a woman who has spent her entire adult life trying to help animals."

Second, the prosecutor stated:

> "The police are doing their job when they come to her house and investigate what happened to the dog, as the police ought to do, and what are the police? The police are some b***-a*** motherf***s coming to her house. How dare they come to her

house and check on what she had done to that dog."

The implication that the State wanted the jury to draw from these facts was that defendant could become extremely angry at a completely innocent individual–such as a dog. Based on these facts, the prosecutor argued: "welcome to the world that Carmello got to live in."

¶ 160 During the State's initial closing, the prosecutor had argued that the chain was "an instrument of cruelty and torture." Defendant's anger was a relevant consideration for the jury in assessing defendant's intent in using, what the prosecutor argued, was an instrument of torture. Thus, we find no error.

¶ 161                                                V. Fines and Fees

¶ 162 Defendant claims that the trial court erred when it imposed: (1) a "Court System" fee of $5 for a violation of the Illinois Counties Code (55 ILCS 5/5–1101(a) (West 2008)); and (2) a $20 charge pursuant to subsection c of section 10 of the Violent Crime Victims Assistance Act (725 ILCS 240/10(c) (West 2008)). The State also asks us to vacate these charges. After reviewing the authorities cited by the parties, we order these charges vacated.

¶ 163 In addition, the State asks us to impose a different charge under a different statutory subsection that was not imposed by the trial court. However, the State does not cite a case or statute to support its proposition that a reviewing court may or should impose a fee or fine that the trial court allegedly failed to impose. *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their argument); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); *Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires). Thus, this issue is waived.

¶ 164                                                CONCLUSION

¶ 165 For the foregoing reasons, we affirm defendant's conviction and vacate the $5 and $20 charges imposed pursuant to section 5–1101(a) (55 ILCS 5/5–1101(a) (West 2008)) and section 10(c) (725 ILCS 240/10(c) (West 2008)).

¶ 166 Affirmed.

¶ 167 PRESIDING JUSTICE GARCIA, specially concurring:

¶ 168 I conclude the defendant forfeited the jury instruction issue she attempts to raise under plain error. See *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (the burden of persuasion under both prongs of plain error remains on the defendant).

¶ 169 To trigger plain error review under prong one, a defendant must argue that the evidence was *closely balanced*. See *People v. Santiago*, 409 Ill. App. 3d 927, 930 n.1 (2011) (plain error claim is forfeited when the defendant does not argue that the evidence was closely

balanced). The "closely balanced" requirement stems from the concern that where the evidence is closely balanced "the error alone severely threatened to tip the scales of justice against [the defendant]." *Herron*, 215 Ill. 2d at 187. Illinois Supreme Court Rule 341 (eff. July 1, 2008) requires that an appellant's brief contain "citation of the authorities" relied upon for the argument. See *Wilson v. Cook County*, 407 Ill. App. 3d 759, 775-76 (2011) ("Failure to establish the facts and authority for an argument supports a finding that an issue is waived under Rule 341."). In the section in her main brief raising this claim, the defendant fails to cite a single case in support of this argument. Absent citation to authority, I find the defendant has not properly raised this prong-one plain error claim. See *People v. Nieves*, 192 Ill. 2d 487, 503 (2000) (citing Supreme Court Rule 341(e)(7) (now Rule 341(h)(7))).

¶ 170    To trigger plain error review under prong two, a defendant must prove that the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 177-79. The defendant attempts to show her trial was fundamentally flawed with the claim that "the State effectively used the faulty instructions on intent to circumvent the entire trial."

¶ 171    "A fair trial, however, is different from a perfect trial. [Citation.] The plain-error doctrine does not instruct a reviewing court to consider all forfeited errors. [Citation.] It is not a 'general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)).

¶ 172    Because there is no pattern instruction for the offense of animal cruelty, the jury was given an instruction that both sides agreed tracked the language of the statute. "[A] jury instruction error rises to the level of plain error only when it 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *Herron*, 215 Ill. 2d at 193 (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2008)). I find nothing in the given instruction that might have led the jury to wrongly convict the defendant; nor has the defendant properly raised such a claim.

¶ 173    Finally, having rejected the defendant's plain error claims, it necessarily follows that the defendant cannot establish ineffective assistance of counsel based on the same error because the defendant cannot show she was prejudiced by counsel's failure to object to the instruction given to the jury. See *People v. Williams*, 391 Ill. App. 3d 257, 271 (2009) ("Having found no plain error based on the erroneous jury instruction, we conclude the defendant is in no better position by placing fault on trial counsel for [her] failure to object to the erroneous instruction ***.").

¶ 174    I specially concur.