2015 IL App (1st) 132059

FOURTH DIVISION
September 24, 2015

No. 1-13-2059

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 08 CR 18065 |
| | ) | |
| FRANK LEE, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     After four horses were removed from deplorable conditions in a barn, two of the horses were treated and recovered from their injuries, but the other two had to be euthanized. Defendant Frank Lee was charged with four counts of aggravated cruelty to a companion animal, a Class 4 felony. The relevant statute, section 3.02 of the Humane Care for Animals Act (Act), states: "No person may intentionally commit an act that causes a companion animal to suffer serious injury or death." 510 ILCS 70/3.02 (West 2008). Following a jury trial, defendant was found guilty on three counts. He was sentenced to two years' probation. The trial court also imposed $639 in fines, fees, and costs.

¶ 2     Defendant appeals his conviction and contends that the State failed to prove him guilty beyond a reasonable doubt of aggravated cruelty because the State failed to connect him to the horses and failed to show that he specifically intended to cause serious injury or death to the horses. He also argues that the trial court erred by refusing his requested jury instruction on the

lesser-included offense of violation of owner's duties. 510 ILCS 70/3 (West 2008). Regarding the trial court's admission of other-crimes evidence, defendant argues that the trial court erred by: not issuing a limiting instruction; barring evidence that defendant was acquitted of the other crime; and violating the hearsay rules by allowing the jury to view a prejudicial offense report regarding the other-crimes incident. The State agrees with defendant's final argument that the trial court improperly imposed two fees.

¶ 3      We hold that the evidence was sufficient to convict defendant of aggravated cruelty. But we also find that the trial court erred in refusing to instruct the jury on the lesser-included offense of violation of owner's duties. We reverse defendant's convictions and remand for a new trial.

¶ 4                                      I. BACKGROUND

¶ 5                                A. Events of July 29, 2008

¶ 6      The Animal Welfare League received a telephone call regarding some horses, in bad shape, at 1965 Glenwood-Lansing Road in Chicago Heights. On July 29, 2008, several individuals went to investigate including: Anthony Estrada, a humane investigator with the Animal Welfare League; Phyllis Piunti, a licensed humane investigator with the South Suburban Humane Society; and Officer Raymond Struck, an investigator with the Cook County sheriff's police special operations unit. All three would later testify at defendant's jury trial.

¶ 7      When they arrived at the property, Donnie Edwards was in the barn at 1965 Glenwood-Lansing Road, but defendant was not present. Defendant does not contest the evidence introduced at trial regarding the conditions at the property that day. In addition to the testimony of Estrada, Piunti, and Struck, this evidence included photographs and a videotape recording.

¶ 8      The evidence at trial established that the horses were in a barn that was very hot, very dark, dirty, cluttered, and full of debris. Ventilation was poor and the barn had strong odors of

ammonia and manure. Some of the stalls were closed with wire or had boards across them and had been nailed shut. There were horses inside these stalls; a crowbar was used to remove the boards. Each stall was approximately 8 feet by 8 feet, although a proper stall should be 10 feet by 10 feet. The stalls contained a huge accumulation—approximately one to three feet high—of petrified, *i.e.*, extremely hard, manure. In two of the stalls, the horses' feet seemed embedded in the manure. Estrada had to shovel some of the manure out of the way to make room for the horses to walk out of the stalls.

¶ 9    Although a horse is usually fed water with a five gallon bucket and a trough filled with a hose, the stalls contained no visible water. Nor was any food available for the horses in the stalls. In the corner of the barn was some hay, but it looked old, dirty, and moldy—unsuitable for a horses' consumption.

¶ 10    The barn contained approximately nine horses and several were extremely thin, were in poor physical condition, and had extremely overgrown hooves. Two of the horses had hooves that were so overgrown they were turned up at the ends. An extreme amount of manure had accumulated in the hooves of one of the horses.

¶ 11    Four of the horses, the subjects in this case, were seized. They were removed from their stalls and placed in a trailer. Because they were unable to walk, the horses had to be brought out carefully, assisted by veterinary and humane animal shelter personnel. According to Piunti, there is a scoring system for the body condition of the horses. The grading is from one to nine, with a score of one being "poor, emaciated" and a core of nine being excessively overweight. Piunti testified that two horses scored "one and a half" and two scored "two and a half."

¶ 12    The horses were taken to Dr. Raymond Morandi's veterinarian office in Orland Park. Dr. Morandi testified at trial that the horses were in poor condition. Due to the condition of their feet,

the horses were unable to walk or stand properly. He testified that if hooves are not trimmed properly and get out of proportion, it causes structural change to the bones, tendons, and ligaments.

¶ 13    All four horses were stallions. One of them was aggressive and had feet that were in such bad condition they were bleeding. He had to be euthanized immediately. The other three horses were treated. One was placed under anesthesia in an attempt to correct the foot. However, the injury to the feet had changed the condition of the bone anatomy, *i.e.*, the bony structure had all been destroyed and disconfigured. That horse also had to be euthanized. Dr. Morandi estimated that it would have taken "at least a couple of years" for the hooves to get in that condition.

¶ 14                                B. Events of August 4, 2008

¶ 15    On August 4, 2008, two investigators from the Cook County sheriff's police animal crimes unit, Investigator Tyra Brown and her partner Investigator Larry Draus went to 1965 Lansing-Glenwood Road. Brown testified at trial that they were in an undercover vehicle in the driveway and were looking for defendant. After approximately 15 minutes, a blue pickup truck being driven by defendant pulled into the entrance of the driveway. The truck stopped at the entrance, turned back out, and drove off in an easterly direction. The officers followed defendant, who turned into the Cook County forest preserve. After defendant provided his identification, the officers placed him in custody.

¶ 16                                C. Indictment

¶ 17    A Cook County grand jury indicted defendant and charged him on four counts of aggravated cruelty to an animal (one count for each horse). The indictment alleged that the offense occurred between December 2007 and July 29, 2008. A codefendant, Donnie Edwards, was also indicted, but the trial court granted a motion for severance.

¶ 18                    D.  Pretrial Motion to Admit Other-Crimes Evidence

¶ 19    Before trial, the State filed a motion to admit evidence of other crimes regarding two

prior incidents, one in 2002, and one on July 13, 2007. The State noted that, although defendant

owned the property on which the horses were found, he had denied any responsibility for their

care or treatment. The 2002 and 2007 incidents involved investigation of equine abuse by

humane investigators and findings of conditions on the property comparable to those that formed

the basis of the charge in the present case. The State contended that these incidents were relevant

to establish the identity of defendant as the person having control over the premises on which the

neglect occurred and defendant's knowledge of the conditions on those premises. The State

explicitly stated that it was not seeking to introduce evidence of the 2007 battery charge against

defendant.

¶ 20    On October 30, 2009, the court denied the motion as to the 2002 incident because its

prejudicial impact would outweigh its probative value. Regarding the 2007 incident, however,

the court granted the State's motion to admit evidence of other crimes. The court stated that it

"serv[ed] to *** establish intent and in particular knowledge that approximately five months

before [the subject] incident, that similar conditions were present at that location. And, that the

defendant by virtue of being given a citation was made aware of that condition." As the court

further explained, the alleged criminal act here was a "failure to act" which, because of its nature,

is not something that happens on one particular day at one particular moment like most crimes.

¶ 21    Over three years later, on April 30, 2013, defense counsel asked for clarification of the

ruling. A different judge reconsidered the ruling. During the hearing, the State reiterated that it

was not seeking admission of any evidence of the battery and further explained it was willing to

redact the language regarding the battery from the copy of the 2007 report. Defense counsel,

however, disagreed and argued that the State was trying to prevent defendant from introducing evidence that defendant was acquitted of the battery. Accordingly, the judge ruled that both the battery charge and the subsequent acquittal on that charge were admissible.

¶ 22                                    E.  Jury Trial

¶ 23                              1. State's Case-in-Chief

¶ 24                              a. Events of July 13, 2007

¶ 25    The State first presented the other-crimes evidence. Piunti, as well as Officer Alexander Brodie, testified regarding the earlier July 13, 2007 incident. The following evidence was adduced.

¶ 26    On July 13, 2007, Piunti and her assistant responded to a call at 1965 Glenwood-Lansing Road. At the time, Piunti was licensed to investigate allegations of animal cruelty and abuse. When she arrived, Piunti saw defendant standing in the driveway and talking with two forest preserve police officers.

¶ 27    Piunti showed her license and explained why she was on the property—that she had received an allegation of animal cruelty. Defendant swore at her and told her to leave the property. The two forest preserve officers suggested she leave the property and call the Cook County sheriff for assistance. Piunti left the property and went across the street to the forest preserve where she called for assistance. The Cook County sheriff's office dispatched Officer Brodie.

¶ 28    Officer Brodie arrived at around 2 p.m. He met with Piunti and her assistant, and all three returned to the property. No one was there.

¶ 29    Piunti and Officer Brodie began to visually inspect the property and the animals on the property. The barn was locked up. There were no open windows or doors and Piunti could not

see inside, but she "could hear hoses inside neighing and making noises and bumping against something inside the barn."

¶ 30 Behind the barn were eight horses and one foal in enclosures. Four or five were in barbed-wire and wire enclosures. Some of the horses were in small "lean-to" stalls that were boarded up in the front and the horses could not get out. The enclosures contained manure, approximately two feet deep, that had not been cleaned out. They also contained buckets that had no water and a "slimy green settlement" on the bottom. There was a trough and a couple of containers, but they too were empty. In addition to there being no water, there was no food. Piunti saw no feed, hay or grass. She saw a lot of hazardous debris. Some of the barbed-wire had come down and was laying in the corral areas. Also in the corral area were boards with protruding nails and pieces of iron and steel.

¶ 31 Piunti testified that all of the horses were underweight. Their hooves were outgrown, cracked, chipped, and in need of farrier care. Applying the previously described scoring system for the body condition of the horses, with "one" indicating "poor, emaciated," Piunti testified that three of the horses scored "one and a half" and the rest were "between two and three." After making these observations, Piunti asked Officer Brodie and her assistant to try to find water and give it to the horses.

¶ 32 Piunti decided to write a citation based on the violations of the Act. She retrieved from her vehicle a tablet and a folder containing her violations and notices. She sat on a bucket and began to write a violation for animal cruelty and neglect. According to Piunti, defendant "appeared back on the property, he pulled up in his vehicle, and got out of his vehicle and approached [her], swearing at [her] and telling [her] to leave his property." He came toward Piunti "using foul language." He was "very very irate." In what Piunti perceived to be a very

threatening manner, defendant came up behind her and told her to leave the property. He pushed her and she fell off the barrel, dropping her papers. She called for Officer Brodie to come for assistance.

¶ 33    After a confrontation with defendant, Officer Brodie called for backup. He secured defendant, went to aid Piunti, and called emergency medical services. Officer Brodie placed defendant in custody, charged him with battery, and took him to the courthouse in Markham.

¶ 34    Later the same day, Piunti finished issuing the citation at the courthouse in Markham. She gave it to an officer who took it to defendant and had him sign it. Defendant was given 48 hours "to provide humane care and treatment, adequate water 24/7, [and] good quality food, and to remove all of the hazardous debris that the animals could get injured on, and to contact [Piunti] so that [they] could resolve this situation."

¶ 35                    b. Events of July 29, 2008 and August 4, 2008

¶ 36    The State next presented evidence pertaining to the events of July 29, 2008, that we previously detailed above, by way of the testimony of Estrada, Piunti, Struck, and Dr. Morandi, plus the photographs depicting the injuries sustained by the four horses and a videotape recording (with the volume muted). The State also presented evidence regarding defendant's arrest on August 4, 2008, by way of the testimony of Brown.

¶ 37                    c. Additional State's Evidence

¶ 38    After all witnesses had testified, the court admitted into evidence, without objection, a self-authenticating document from the Illinois Secretary of State: Articles of Incorporation for the Bar El Equitation, showing the address of 1965 Glenwood-Lansing Road with defendant as the initial registered agent.

¶ 39                    2. Defense Case

¶ 40    After the State rested, defendant made a motion for a directed finding. The trial court denied the motion. Defendant did not present any witnesses or evidence.

¶ 41                        3. Jury-Instructions Conference

¶ 42    Defendant offered a non-Illinois Pattern Instruction on a lesser-included offense of violation of owner's duties. The State objected. The court refused to give the instruction and ruled that the instruction was improper because the facts did not bear out the elements of the offense.

¶ 43                        4. Conclusion of Trial and Sentencing

¶ 44    After closing arguments, the court discussed which exhibits would go back to the jury room. Defense counsel objected to Piunti's written complaint regarding the July 13, 2007 incident being sent back to the jury. The trial court ruled it could be sent back but with the language "assaulted investigator Phyllis and Officer Brodie arrested" redacted.

¶ 45    During its deliberations, the jury sent four notes. One requested the definition of "criminal serious injury." Defense counsel contended that the jurors apparently had a real question as to what "criminal serious injury" (one of the elements of the charged offense) and again requested that the lesser-included instruction on owner's duties be given. The court denied the request.

¶ 46    The jury acquitted defendant of the charge related to one of the horses and convicted him on the other three counts. The court denied defendant's motion for a new trial.

¶ 47    On May 31, 2013, the court sentenced defendant to two years' probation. The court also assessed fines, fees, and costs totaling $639.

¶ 48                              II. ANALYSIS

¶ 49                        A. Sufficiency of the Evidence

¶ 50    Defendant first challenges the sufficiency of the evidence. We must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. As a court of review, it is not our function to retry the defendant or to substitute our judgment for that of the jury. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). The trier of fact, who is in the best position to resolve any conflicting inferences produced by the evidence, is not required to disregard inferences that flow from the evidence nor search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41. A reviewing court will reverse a defendant's conviction only if the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). This standard of review applies whether the evidence is direct or circumstantial. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The standard also gives " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Campbell*, 146 Ill. 2d 363, 375 (1992) (quoting *Jackson v. Virginia* 443 U.S. 307, 319 (1979)).

¶ 51    As noted, section 3.02 of the Act states: "No person may intentionally commit an act that causes a companion animal to suffer serious injury or death." 510 ILCS 70/3.02 (West 2008). There is no dispute the horses at issue were companion animals. Section 2.01a of the Act states: " 'Companion animal' includes, but is not limited to, canines, felines, and equines." 510 ILCS 70/2.01a (West 2008). This court has interpreted section 3.02 of the Act as requiring the State to prove two propositions, that a defendant (1) intentionally committed the act and (2) had a specific intent to seriously injure or kill the animal. *People v. Primbas*, 404 Ill. App. 3d 297, 301

(2010); accord *People v. Land*, 2011 IL App (1st) 101048, ¶ 88. In other words, a defendant must intend *both* the act *and* the resulting serious injury or harm.[1]

¶ 52    In arguing the insufficiency of the evidence, defendant focuses on the second element of the offense. Defendant says that "the State failed to show that [defendant] specifically intended to cause serious injury or death to the horses." Defendant does not deny the horrific conditions discovered at the property or the serious injuries incurred by the horses, two of whom had to be euthanized. Nor does he dispute that he owned the property. Instead, defendant argues that the State's evidence was insufficient because: (1) there was no evidence that he had been seen at any time on the property during the eight-month period alleged in the indictment; (2) no one testified that defendant knew anything about the horses or that he had ever entered the barn in which they were found; and (3) no witness testified to having seen defendant with any horse or having heard him talk about any horse. In sum, defendant argues that the evidence "failed to connect him to the horses at all."

¶ 53    We begin our analysis with the familiar notion that intent, a state of mind, is rarely proven by direct evidence. *People v. Williams*, 165 Ill. 2d 51, 64 (1995). People rarely express their intention to commit a criminal act, and thus intent may be proven by circumstantial evidence. *Id.*; *Primbas*, 404 Ill. App. 3d at 302. The common law is filled with examples where the State successfully proved intent through circumstantial evidence. See, *e.g.*, *People v. Enoch*, 122 Ill. 2d 176, 197 (1988) (specific intent to commit rape "may be inferred from the

---

[1] We initially had some reservations about *Primbas*'s interpretation of this statute, that the statute required both intent to commit an act *and* intent that serious injury or death result. We asked the parties for supplemental briefing on the issue of whether *Primbas* was correctly decided, or whether the statute required only intent to commit the act, but not intent to cause serious harm or death. But defendant's supplemental brief has convinced us that our initial concern was misplaced, and the State—the party that would benefit from a reconsideration of *Primbas*—takes the position that *Primbas* was correctly decided, too. We will thus discuss the matter no further. We thank the parties for their supplemental briefing.

circumstances of the assault"); *People v. Richardson*, 104 Ill. 2d 8, 12-13 (1984) (jury could properly rely on any reasonable inference to conclude that no other scenario was as likely as straightforward conclusion that defendant entered club with intent to commit theft); *People v. Terrell*, 99 Ill. 2d 427, 432 (1984) (jury could infer necessary intent, *i.e.*, specific intent to commit completed crime, from surrounding circumstances); *People v. Myers*, 85 Ill. 2d 281, 289 (1981) (intent to kill may be shown by circumstances).

¶ 54    As we have noted, the State must prove that defendant intentionally committed an act and that defendant intended serious injury or death to the animal to result from that act. *Primbas*, 404 Ill. App. 3d at 301. The Illinois Criminal Code of 1961 (the law in effect at the time of the alleged offense) provides that an "act" includes "a failure or omission to take action." 720 ILCS 5/2-2 (West 2008); see also *People v. Caruso*, 119 Ill. 2d 376, 383 (1987) ("the Criminal Code has eliminated the distinction between 'omission' and 'act' "). And if this were not clear enough, we have previously held that the word "act" in the very statute at issue included an omission. See *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 120-22 (failure to remove tow chain from dog's neck could constitute "act" under aggravated cruelty statute).

¶ 55    As the trial court explained, this was predominantly a failure-to-act, or omission, case. Nobody claims that defendant beat or strangled or shot the horses. The claim is that defendant caused the horses to suffer greatly by severe deprivation—not feeding them sufficient food or water, not cleaning their stables, not trimming their hooves to prevent pain and bone deformation, and functionally locking them into an immobile position through the combination of the piles of hardened manure and locked stable doors. As the trial court noted, these deprivations did not happen on a particular day or moment but over an extended time.

¶ 56    Indeed, Dr. Morandi testified that the condition of the horses' hooves would have taken "at least a couple of years" to reach that horrific stage. And the multiple feet of petrified manure in which the horses were effectively trapped did not happen overnight; we have no specific testimony on an estimate, but for horse manure to pile up in an eight-by-eight stall to several feet and petrify, such that the rescuers had to take a shovel to break and dig it out just to clear a path for the horses, clearly would take an extended period of time. And once the horses were liberated, they could barely walk—one suffering so grievously that it had to euthanized almost immediately. The emaciated state of the horses, the sight of moldy hay in the stable, the horrific overgrowth of the horses' hooves, the enormous piles of petrified manure, and the horses' inability to walk without pain or difficulty once they were freed could easily lead the jury to conclude that these stomach-turning conditions persisted over a very lengthy period of time.

¶ 57    The State also presented evidence concerning the doors to the horses' stalls. Two of the stalls were nailed shut with two-by-fours. The other two were wired shut. The evidence showed that this was an unusual way to cage a horse. More importantly, those boards did not hammer themselves into place. Somebody nailed those stall doors shut. That is no omission.  That is an intentional act. The jury could have rationally concluded two things from that evidence alone— that the keepers of these horses had no plans to let the horses out any time soon, nor did they plan to clean the stalls or tend to the horses in any way.

¶ 58    The jury heard evidence that defendant owned the property, through his own words to investigators during the 2007 incident and via the articles of incorporation for his corporation, which listed the subject property as its address (and defendant, on appeal, does not deny ownership). And the State presented evidence that defendant was put on notice, during the 2007 incident, of grossly substandard conditions and maltreated horses on that same property. The jury

then heard evidence that slightly over a year later, the four horses in question were discovered in atrocious conditions and in physical states so dire that two of the four were euthanized, one almost immediately and one later due to the tremendous abnormality in its bone formations caused by the untreated hooves.

¶ 59    Finally, the evidence showed that, on August 4, 2008, the day that law enforcement officers arrived at the property to arrest defendant, they saw defendant's car drive up to the property but then immediately turn and drive away. The jury could have rationally interpreted this action as evidence of flight and thus consciousness of guilt. See, *e.g.*, *People v. Jimerson*, 127 Ill. 2d 12, 45 (1989) ("the defendant chose to depart the area when law enforcement officers began their sweep through the crowd"); accord *People v. Moody*, 75 Ill. App. 3d 674, 681 (1979) ("Such evidence of flight is admissible to show consciousness of guilt where a defendant has knowledge of the crime and of his status as a suspect.").

¶ 60    Defendant concedes that all of this evidence was presented but claims that he cannot be legally culpable for these omissions and deprivations, because there is no evidence that he was on the property during the window of time alleged in the indictment, December 2007 through July 29, 2008, nor is there evidence that he even knew of the condition of the horses during that time period. We see it differently. Taken together, in the light most favorable to the State, the evidence showed that defendant knew of terrible, dangerous conditions on his property in July 2007, and that a year later, in July 2008, similar, if not worse conditions were discovered again. And at least some of these conditions (the overgrown hooves, which the veterinarian said would take years to develop, and the multiple feet of petrified manure, which must have taken some considerable amount of time to accumulate) happened over an extended period of time that would cover much, if not all, of the window of time between those two bookends. The jury could

reasonably conclude that defendant knew about these conditions in July 2007 and consciously allowed them to continue for over a year. It may, in fact, be true that defendant never set foot on the property again after the 2007 incident, but if so, the jury could rationally find intent from the fact that defendant was made aware of horrendous conditions and then turned his back and walked away without making any attempt to correct the conditions. The jury could have found from those facts that defendant intended those conditions to continue.

¶ 61     We find support for our conclusion in *Land*, 2011 IL App (1st) 101048, ¶¶ 120-22, where the defendant was convicted of aggravated cruelty for putting a heavy tow chain around her dog's neck. The defendant claimed that after initially placing the chain around the dog's neck, she delegated further care of the dog to her 12-year-old son. A community service officer came out to the house and specifically told the defendant that a tow chain was not an appropriate collar for a dog, but the defendant allowed that tow chain to remain around the dog's neck—or, at a minimum, did nothing to correct the condition. We found that this evidence was sufficient to find the defendant guilty of an intentional act under the law, either "based on [defendant's] omission or on her own affirmative actions." *Id*. ¶ 122. *Land* thus supports the proposition that a defendant may be guilty of an intentional act where he or she continues to allow a cruel condition to exist with regard to an animal even after being put on specific notice that the condition was improper.

¶ 62     And if the jury could properly find that defendant intentionally chose not to help these animals, it could just as easily have found that defendant intended the consequences of that omission. Indeed, the prolonged absence of sufficient food and water could only lead to emaciation and ultimately death. The failure to trim the hooves would inescapably lead to the hooves becoming overgrown, with all the attendant pain and bone deformation to the horses. The fact that horses are locked (in two cases, literally nailed) into stalls and forced to stand in one

place, making it difficult not only for the horses to move but for the keepers to tend to them and their stalls, would logically lead to serious consequences for the animals as well. A rational juror could find that defendant intended to cause these horses serious bodily injury or death.

¶ 63    We do not deny that this evidence could be viewed another way. Defendant has attempted to portray himself as the "absentee landlord," who had no connection to this property or the horses, who had no idea what was taking place on his land. It is not an implausible theory; defendant is correct that no evidence placed him on the property during the window of time alleged in the indictment. Defense counsel, in closing argument, tried to blame everything on his employee found at the scene, which could also conceivably be true. But the jury heard no *evidence* of that. The jury heard no evidence that the employee, not defendant, was to blame, or that defendant made any effort to remedy the conditions, either personally or through his employee. All the jury heard was that defendant was made aware of these conditions in 2007 and that, a year later, they persisted and were even worse. That evidence was sufficient to show defendant's intent to allow those conditions to continue, regardless of whether defendant visited the property frequently or never at all. The jury was under no obligation to conjure up possible theories of innocence on defendant's behalf. *Richardson*, 104 Ill. 2d at 12-13 (jury could accept "straightforward" inference of intent to commit theft and reject other possible scenarios put forth by defendant). Nor will this court search out possible theories of acquittal or invent hypotheticals and prefer them over the findings of the jury. *Bonaparte*, 2014 IL App (1st) 112209, ¶ 41. Our function is to determine whether a jury could have rationally found guilt beyond a reasonable doubt as to each element of the offense. *Jackson*, 232 Ill. 2d at 281. We hold that it could have so found.

¶ 64                    B. Violation of Owner's Duties Instruction

¶ 65    Defendant next argues that the trial court erred in denying his request for a jury instruction on the lesser-included offense of violation of owner's duties. He contends that the key difference between that lesser-included offense and aggravated cruelty is mental state, and the evidence rationally supported a conviction on the lesser offense only.

¶ 66    Giving the jury an instruction on a lesser-included offense provides an important "third option" to the jury. *People v. Ceja*, 204 Ill. 2d 332, 359 (2003). If the jury is not certain that the State has proved the charged offense but believes that a defendant is "guilty of something," the jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense. *Id*. We first determine whether the offense of violation of owner's duties is a lesser-included offense, an issue of law we review *de novo*. *People v. Kennebrew*, 2013 IL 113998, ¶ 18.

¶ 67    A lesser-included offense is "established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9 (West 2008). When deciding whether an uncharged crime is a lesser-included offense of the charged offense, we use the charging-instrument approach. *Kennebrew*, 2013 IL 113998, ¶ 32. Both parties agree this is the applicable approach here.

¶ 68    "[U]nder the charging instrument approach, whether a particular offense is 'lesser included' is a decision which must be made on a case-by-case basis ***." *People v. Kolton*, 219 Ill. 2d 353, 367 (2006); accord *People v. Meor*, 233 Ill. 2d 465, 470 (2009). The court makes this decision by looking at the facts alleged in the charging instrument to see whether the description of the greater (charged) offense contains a "broad foundation" or "main outline" of the lesser offense. (Internal quotation marks omitted.) *Kennebrew*, 2013 IL 113998, ¶ 30; *People v. Miller*,

238 Ill. 2d 161, 166 (2010). The indictment need not explicitly state all of the elements of the lesser offense, so long as any missing element can be reasonably inferred from the indictment allegations. *Kennebrew*, 2013 IL 113998, ¶ 30; *Miller*, 238 Ill. 2d at 166-67. Unlike the abstract-elements approach, where it must be impossible to commit the greater offense without necessarily committing the lesser offense (*Kennebrew*, 2013 IL 113998, ¶ 29), under the charging instrument approach, the lesser offense need not be a "necessary" part of the greater offense. (Internal quotation marks omitted.) *Id.* ¶ 30.

¶ 69     Section 3 of the Act, entitled "Owner's duties," provides in relevant part:

"Each owner shall provide for each of his animals:

(a) sufficient quantity of good quality, wholesome food and water;

(b) adequate shelter and protection from the weather;

(c) veterinary care when needed to prevent suffering; and

(d) humane care and treatment." 510 ILCS 70/3 (West 2008).

The Act defines "owner" as "any person who (a) has a right of property in an animal, (b) keeps or harbors an animal, (c) has an animal in his care, or (d) acts as custodian of an animal." 510 ILCS 70/2.06 (West 2008).

¶ 70     The State argues that the indictment did not include a "broad outline" for violation of owner's duties. That is plainly incorrect. All four counts of aggravated cruelty in the indictment alleged that defendant intentionally caused a companion animal to suffer serious injury or death in that defendant "failed to provide adequate food, water, shelter and [health] care for [the horse], causing serious injury to the animal." Those allegations closely track the owner's duties statute.

¶ 71     It is true that the indictment did not explicitly allege that defendant was the "owner" of the animals. Nor did the indictment allege, pursuant to the Act's definition of owner, that

defendant had a right of property in the animal, kept or harbored the animal, had the animal in his care, or acted as custodian of the animal. Nonetheless, this element of the lesser offense may reasonably be inferred. As defendant correctly notes, no one has an obligation to feed, water, shelter or otherwise care for an animal that he does not own or for which he is responsible. We agree with defendant that, in this case, violation of owner's duties was a lesser-included offense of aggravated cruelty.

¶ 72     The identification of a lesser-included offense, however, does not automatically entitle the defendant to have the jury instructed on that offense. *People v. Stewart*, 406 Ill. App. 3d 518, 536 (2010). Once a lesser-included offense is identified, a court must examine the evidence presented at trial to determine whether the evidence rationally supports a conviction for the lesser-included offense. *Id.*

¶ 73     An instruction on a lesser-included offense is justified where there is "some" evidence to support the giving of the instruction. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). While the decision whether to instruct the jury on a lesser-included offense is subject to an abuse-of-discretion standard (*id.*), the law is clear that if some evidence has been presented to support that instruction, it is an abuse of discretion not to give it. *People v. DiVincenzo*, 183 Ill. 2d 239, 251 (1998) (jury should have been instructed on involuntary manslaughter, where "[s]ome evidence" suggested that defendant lacked mental state to convict him of first-degree murder).

¶ 74     There is no question that the evidence at trial supported this instruction. Virtually all of the evidence at trial detailed the gross deprivation of food and water, humane treatment, and veterinary care. As for ownership, we have previously detailed the evidence that defendant owned the property. And though the jury found intent based on the evidence, a finding we have upheld, the jury could have reasonably found that intent to permit this deprivation and/or intent

to cause serious harm or death to the animals was lacking. The State's case on intent was sufficient but not, by any measure, overwhelming. As there was no evidence that defendant set foot on the property during the window of time at issue, the jury reasonably could have accepted defendant's argument at trial that he was an absentee, unknowing owner, and thus that he lacked the requisite intent. Had the jury so found, the only proper conviction would have been for violation of the owner's duties statute, not aggravated cruelty.

¶ 75    The law mandated that the jury be given the instruction on the lesser-included offense of violation of the owner's duties statute. The court erred in not giving it. We have no choice but to reverse defendant's convictions and remand for a new trial.

¶ 76                              C. Other Issues

¶ 77    Defendant raises other issues in support of reversal of his conviction and remandment for a new trial. Defendant contends that that the trial court erred by: (1) not issuing a limiting instruction when it admitted evidence from the events of July 2007; (2) barring evidence that defendant was acquitted of the battery charge with which he was charged, arising from the 2007 incident; and (3) allowing the jury to view a prejudicial offense report regarding the 2007 incident. Although, on the surface, the first two arguments appear meritorious, we need not address them because we are already ordering a new trial.

¶ 78    Finally, the State agrees with defendant's argument that the $5 Electronic Citation fee and the $5 Court System fee were improperly assessed and should be vacated. Having reversed defendant's conviction, however, his request to correct the fines and fee order is now moot, and we need not discuss the issue further.

¶ 79                              III. CONCLUSION

¶ 80    We hold that the evidence was sufficient to find defendant guilty of aggravated cruelty beyond a reasonable doubt. But we also hold that the trial court committed reversible error by failing to instruct the jury on the lesser-included offense of violation of the owner's duties statute. We reverse defendant's conviction for aggravated cruelty and remand this matter for a new trial.

¶ 81    Reversed and remanded.