NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240562-U

NO. 4-24-0562

IN THE APPELLATE COURT

FILED
May 15, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| CORTEZ HOUSTON, | ) | No. 21CF495 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert Randall Wilt, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Grischow and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed defendant's conviction for aggravated cruelty to a companion animal where the State proved that defendant deprived his one-year-old dog of food, causing her to die of starvation.

¶ 2    The State charged defendant, Cortez Houston, with two counts of aggravated cruelty to a companion animal (510 ILCS 70/3.02(a) (West 2020)), six counts of cruel treatment of an animal (510 ILCS 70/3.01(a) (West 2020)), and six counts of violation of owner's duties to an animal (510 ILCS 70/3(a)(1) (West 2020)). The case proceeded to a jury trial. At the close of the State's case, defendant moved for a directed verdict, which the trial court granted in part and denied in part, leaving one count of aggravated cruelty, one count of cruel treatment, and four counts of violation of owner's duties. The jury found defendant guilty of all the remaining charges. The court sentenced defendant to three years in prison for aggravated cruelty. Defendant appeals, arguing that the State failed to prove he had the requisite intent to commit the offense. For the

reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                        A. Charges

¶ 5          On March 18, 2021, the State charged defendant in a 14-count criminal complaint. On March 27, 2023, the grand jury returned a corrected superseding bill of indictment containing the same 14 charges. In counts I and II, the State charged defendant with aggravated cruelty to two dogs. In counts III through VIII, the State charged defendant with cruel treatment of five dogs. In counts IX through XIV, the State charged defendant with violation of owner's duties with respect to two dogs. Counts I and IV pertained to a dog named "Star"; counts II and VI pertained to an unnamed dog; count III pertained to a dog named "Empress"; count V pertained to a dog named "Duchess"; counts VII, IX, X, and XI pertained to a dog named "Luna"; and counts VIII, XII, XIII, and XIV pertained to a dog named "Princess." Specifically, count I alleged that defendant committed aggravated cruelty to a companion animal by "failing to adequately feed a *** dog in his possession, causing the animal's death."

¶ 6                                        B. Jury Trial

¶ 7          The trial court held a jury trial in August 2023. Teresa Lagerstam, an investigator for Winnebago County Animal Services (Animal Services), was the State's first witness. She testified that she had been an Animal Services investigator for 13 years and had experience observing both healthy and unhealthy animals. On December 29, 2020, Lagerstam went to 3004 Bildahl Street in Rockford after receiving a call from an Animal Services officer about "three skinny dogs eating a fourth dog that was deceased in the back yard."

¶ 8          When Lagerstam arrived at the property, she saw three "very skinny" dogs running back and forth in a locked, fenced-in area in the backyard. Lagerstam testified that the dogs "looked

like they were picking up a body, eating it, and then they were growling." Lagerstam had the locks cut off the gate and retrieved the dogs because she "was concerned for their safety." Lagerstam said she could see the hips, ribs, and backbone on all three dogs. The deceased dog had "pieces of its body missing." Lagerstam testified that she impounded all four dogs because of "[t]heir condition, that they were emaciated, so very skinny, and that the one was dead."

¶ 9        Lagerstam testified that she looked around the entire backyard and in an attached garage and saw no sources of food or water for the dogs. Lagerstam took photographs of the backyard, which were admitted into evidence and published to the jury. In the photos, Lagerstam identified several empty five-gallon buckets in the backyard. Inside the garage, Lagerstam saw a blue bowl, which was also empty.

¶ 10        Lagerstam also took photographs of the impounded dogs. Those photos were admitted into evidence and shown to the jury. Those photographs showed the body of the deceased dog, which had no name, as well as dogs named Duchess, Empress, and Princess. Lagerstam pointed out that Duchess's ribs and hips were sticking out and her backbone was visible.

¶ 11        Lagerstam testified that on December 29, 2020, she spoke to Meredith Luttrell, who lived at the Bildahl property. Luttrell told Lagerstam that the dogs belonged to defendant and his wife, Carla Houston. Lagerstam testified that she wanted to contact the dogs' owners because of the condition of the dogs. She said she was "concerned with owner's duties and cruel treatment."

¶ 12        On January 13, 2021, Lagerstam went to 2619 Lapey Street in Rockford after an animal control officer employed at Animal Services called her about a "dog being skinny" on the property. When Lagerstam reported to that address, she saw a fenced-in backyard, where there was a mastiff that was so skinny she "could see the hips, ribs, and backbone." Lagerstam noticed the dog was squinting and thought something was wrong with her eyes. When Lagerstam went into

the garage connected to the backyard, she discovered "a small[,] yellow dog dead on the ground." Lagerstam said she could "see its ribs" and that "it didn't have any fatty tissue on it." In the backyard, Lagerstam saw some buckets with no food or water in them and a "chewed up" water hose that dogs "weren't able to get water from." Lagerstam impounded the dogs because "one was dead and one was very emaciated."

¶ 13 Lagerstam took photographs of the backyard and dogs at the Lapey Street property. Those photographs were admitted into evidence and shown to the jury. Those photographs depicted the "chewed-up" water hose connected to a faucet on the side of the house, the deceased dog, named Star, and the other dog, named Luna. According to Lagerstam, the photos showed that Luna's ribs and hips were visible. The photos of the backyard showed that the ground was covered in snow.

¶ 14 Lagerstam testified that she spoke to defendant by phone on January 13, 2021. Defendant told Lagerstam that he had been to the Lapey Street property earlier that morning to take care of the dogs. Defendant told her that the dogs were his but instructed Lagerstam to "leave the ticket for his wife" because "he didn't want to pay for the fine." Lagerstam testified that defendant told her the dogs at the Bildahl Street property did not belong to him. When Lagerstam told defendant that one of the dogs at that property was dead, he responded, "[D]ogs die all the time."

¶ 15 Lagerstam testified that she spoke to defendant again by phone on March 1, 2021. During that conversation, defendant told Lagerstam that he "brought over food" and "left the water dripping" from the hose for the dogs on Lapey Street on the morning of January 13, 2021. Defendant said his wife lived at the Lapey Street property but that he was the dogs' "caretaker." Lagerstam testified that the dogs were not registered to anyone. Defendant said he would not

register the dogs in his name "[b]ecause of the fees and fines." When Lagerstam told defendant that Star died because of lack of food, defendant replied, "[S]o that's natural causes, right."

¶ 16    Lagerstam agreed that water was "dripping" out of the hose in the backyard on Lapey Street but said the "dog[s] couldn't get it" because "[t]he water was dripping on the ground." She testified that, other than the hose, the only source of water for the dogs was possibly the snow on the ground. On redirect examination, Lagerstam testified that defendant told her he was responsible for putting out buckets of food and water for the dogs at the Lapey Street property.

¶ 17    The State's next witness was Allison Lisney, a former animal control officer for Animal Services. Lisney testified that she went to 3004 Bildahl Street to follow up on "a welfare complaint that had been filed." When she arrived, she located dogs behind a privacy fence. After receiving permission from Lagerstam, she cut the lock off the gate to the fence and entered the backyard. In the backyard, she found three live dogs that were "extremely underweight." She also observed a deceased dog in the backyard.

¶ 18    Lisney testified that, as an animal control officer, she received training about evaluating the health of animals and had "severe" concerns about the welfare of the dogs on Bildahl Street. Lisney's concerns were that the dogs were "skinny, underweight," and "fighting each other." Lisney testified that she "could see bones protruding and a lack of fat on the body" of all three dogs. While she was on the property, Lisney saw no food or water but did see an empty "ripped up" dog food bag in the garage.

¶ 19    Lisney reported to 2619 Lapey Street on January 12, 2021, after receiving a call about animals at that location. There, Lisney saw an "underweight" dog with a "moderate to severe eye infection." She observed no food or water on the property, only "empty buckets." She did not recall seeing a hose at the property.

¶ 20        The State's next witness was Meredith Luttrell. She testified that she lived at 3004 Bildahl in December 2020. Luttrell testified that she rented the property from defendant's wife, Carla. Luttrell testified that the dogs kept in the backyard of the property belonged to her daughter. She testified that she remembered someone coming and taking the dogs but did not recall any conversation she had with that individual because she "was very heavily sedated" following her father's death. Luttrell denied telling Lagerstam that defendant owned the dogs or that he was at the property the night of December 28, 2020, to take care of the dogs. Luttrell said Tyrone, her daughter's friend, took care of the dogs and put the locks on the gate.

¶ 21        The State recalled Lagerstam, who testified that during her conversation with Luttrell on December 29, 2020, Luttrell told her that the dogs in the backyard belonged to defendant and that he was there the night before to take care of them. Lagerstam further testified that Luttrell told her she could not get into the backyard or garage because the gate was locked.

¶ 22        The State's next witness was Charles Castelein, an expert in veterinary medicine. Castelein performed a necropsy, the animal version of an autopsy, on Star, a one-year-old pitbull mix. Castelein reported that Star's body condition score was a 1 on a scale of 1 to 9, with 5 "being ideal" and anything less than 5 being "on the underweight side." Castelein explained that a dog with a score of 1 is "extremely emaciated." Castelein further explained that "[i]n an ideal dog, there should be a nice layer of fat in the subcutaneous tissue and the fascia that covers the muscles," but he found "no subcutaneous fat" on Star. In Star's stomach, Castelein found only "foreign material," consisting of leaves and twigs. Castelein saw no evidence that Star ingested dog food in the 24 hours before her death.

¶ 23        Photographs of Star were admitted into evidence. In one of those photos, Castelein pointed out Star's "very prominent" ribs, which he said would not be visible "on an ideal dog."

Castelein also noted a "fair amount of muscle catabolism" in "[t]he shoulder muscles up at scapulars." Castelein explained that muscle catabolism means "[m]uscle wastage." He then explained:

> "The body uses muscle basically as a last resort for energy. Fat is utilized real early in the starvation process. As the starvation goes on, the body starts to catabolize muscle tissue to meet its energy needs. And over the hips on this dog, right around the tail head, you can see where the muscles of the hip have been catabolized."

¶ 24 Castelein determined that Star's cause of death was starvation after ruling out all other possible causes. Castelein saw no signs of injury or disease in Star. Castelein concluded that Star "was simply not fed enough to meet her *** metabolic needs to sustain life under conditions in which [she] was kept." In other words, Star was not provided adequate food.

¶ 25 On cross-examination, Castelein agreed that he did not perform a histopathology on Star, which would require taking samples of tissue and sending them to a lab for microscopic examination. On redirect examination, Castelein testified that a histopathology is not required in every necropsy because it is expensive and typically only necessary if his "gross findings" from his internal or external exam make him suspicious about disease or poison. Castelein testified that he did not observe anything during his necropsy of Star indicating that a histopathology was necessary.

¶ 26 The State's final witness was Bridget Holck, an expert in veterinary medicine. Holck testified that she was unable to perform "a full necropsy exam" on the unnamed female mastiff taken from the Bildahl Street property on December 29, 2020, because too much of her body was missing. Holck explained that "the dog was mostly not there." While the dog's head, limbs, and tail were present, "most of her internal organs *** were missing."

Holck noted that the dog "had several broken bones" and "scratches on the skull." She determined that the dog's injuries were "consistent with other dogs eating the body of this dog." Based on Holck's examination, the dog was between 8 and 18 months old. Holck was not able to determine the dog's cause of death but determined that the dog was "under conditioned." Holck explained that an under conditioned animal often is not provided enough nutrients to attain a healthy weight.

¶ 27 The State admitted into evidence warranty deeds from the properties at issue. The deed for the Lapey Street property listed defendant as the owner, and the deed to the Bildahl Street property listed defendant's wife, Carla, as the owner. The State then rested, and defendant moved for a directed verdict. The trial court granted defendant's motion with respect to counts II, III, V through VIII, X, and XIII but denied it with respect to counts I, IV, IX, XI, XII, and XIV.

¶ 28 Defendant called his wife, Carla, as his only witness. Carla testified that she lives at 2619 Lapey Street in Rockford. She testified that two dogs were kept outside the home on January 13, 2021: Luna, a "Cane Corso," and Star, a pitbull mix. Carla testified that Luna had been her dog since she was eight or nine weeks old. Carla testified that Star had been staying in her backyard for a few days to a week as of January 13, 2021, and belonged to her friend, Yesenia. Carla explained that the dogs in the backyard did not come inside the house but could go in and out of a heated garage.

¶ 29 Carla testified that Star "seemed okay" the first day she was there but stayed in the garage "a lot." On the second or third day, Carla "noticed it coughing." After that, Carla witnessed Star "throwing up," so she called Yesenia. Carla testified that she was responsible for feeding Star and did so twice a day by filling up bowls inside the garage and yard with food and water. She said she let the nozzle for the hose drip, "so the water was always available." Carla testified that she fed Star and Luna on the morning of January 13, 2021. She said defendant helped out with the

dogs once or twice, but she said, "[I]t was mainly my responsibility to feed them and watch them." Carla testified that when Animal Services came to her home on January 13, 2021, she told the employees that Star did not belong to her or defendant but never told them who Star's owner was. After Carla testified, the defense rested.

¶ 30    The State then recalled Lagerstam. She testified that when she spoke to defendant on the phone on March 1, 2021, he told her that he had both Luna and Star "since they were puppies." Lagerstam further testified that when she spoke to Carla on January 13, 2021, Carla told her that Luna and Star belonged to defendant. Lagerstam denied that Carla or defendant ever told her that Star belonged to someone named Yesenia.

¶ 31    At the close of the case, defendant filed a motion for directed verdict on the six remaining charges, which the trial court denied. The jury returned a guilty verdict on all those counts.

¶ 32                                C. Posttrial Proceedings

¶ 33    Defendant filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial. The trial court denied the motion. The court sentenced defendant to three years in prison for aggravated cruelty. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 34    This appeal followed.

¶ 35                                II. ANALYSIS

¶ 36    Defendant appeals his conviction, arguing that the State failed to prove he had the requisite intent to commit aggravated cruelty beyond a reasonable doubt.

¶ 37    When a defendant challenges the sufficiency of the evidence on appeal, it is not the reviewing court's function to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

The jury is "responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts." *People v. Harris*, 2018 IL 121932, ¶ 26. A reviewing court will not substitute its judgment for that of the jury. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). Rather, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Cooper*, 194 Ill. 2d at 430-31 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "This standard applies whether the evidence is direct or circumstantial, and 'circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction.' " *People v. Aljohani*, 2022 IL 127037, ¶ 66 (quoting *People v. Jackson*, 2020 IL 124112, ¶ 64). We will reverse a conviction only if the "evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

¶ 38 Aggravated cruelty is defined by statute as "intentionally commit[ting] an act that causes a companion animal to suffer serious injury or death." 510 ILCS 70/3.02 (West 2020). To convict a defendant of aggravated cruelty of a companion animal, the State must prove the defendant (1) intentionally committed the act and (2) intended to seriously injure or kill the animal. *People v. Robards*, 2018 IL App (3d) 150832, ¶ 13. "In other words, a defendant must intend *both* the act *and* the resulting serious injury or harm." (Emphases in original.) *People v. Lee*, 2015 IL App (1st) 132059, ¶ 51.

¶ 39 The Criminal Code of 2012 (Criminal Code) provides that an " '[a]ct' includes a failure or omission to take action." 720 ILCS 5/2-2 (West 2020). The Criminal Code additionally provides that "a voluntary act" includes "an omission to perform a duty." 720 ILCS 5/4-1 (West 2020). Based on those definitions, the term "act" contained in the aggravated cruelty statute

includes omissions. *Lee*, 2015 IL App (1st) 132059, ¶ 54 (citing *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 121-22). Thus, a defendant can be proven guilty of aggravated cruelty for failing to act. See *Robards*, 2018 IL App (3d) 150832, ¶ 13; *Lee*, 2015 IL App (1st) 132059, ¶ 55; *Land*, 2011 IL App (1st) 101048, ¶ 122.

¶ 40      "Because intent is a mental state, it can rarely be proven by direct evidence." *Robards*, 2018 IL App (3d) 150832, ¶ 14. Thus, "intent may be demonstrated through circumstantial evidence." *People v. Primbas*, 404 Ill. App. 3d 297, 302 (2010). An intent to kill or injure "may be inferred from the character of the defendant's acts and the circumstances surrounding their commission." *People v. Kirkpatrick*, 2020 IL App (5th) 160422, ¶ 59.

¶ 41      The undisputed evidence at defendant's jury trial established that a one-year-old dog named Star (1) was found dead in a garage on property owned by defendant, (2) was "extremely emaciated," (3) had only twigs and leaves in her stomach, (4) had no fat on her body, (5) had muscle catabolism, (6) had the lowest body condition score possible, and (7) died of starvation. The evidence also established that buckets and bowls on the property that should have contained food and water were empty. Furthermore, Luna, the other dog in the backyard with Star, was described as "very emaciated" and "underweight," with her hips, ribs, and backbone clearly visible. Defendant contends that this evidence was insufficient to establish that he possessed the intent to kill or injure Star. We disagree.

¶ 42      A defendant intends "the natural and probable consequences of his acts." *People v. Terrell*, 132 Ill. 2d 178, 204 (1989). "The natural consequence of not feeding or providing water to pets is that they will die." *Robards*, 2018 IL App (3d) 150832, ¶ 15; see *Lee*, 2015 IL App (1st) 132059, ¶ 62 ("[T]he prolonged absence of sufficient food and water could only lead to emaciation and ultimately death."). Therefore, if a defendant fails to provide adequate food to his pet, he has

the requisite intent to commit the offense of aggravated cruelty to a companion animal. See *Robards*, 2018 IL App (3d) 150832, ¶ 15; see also *Lee*, 2015 IL App (1st) 132059, ¶ 62 (holding a jury could reasonably conclude that a defendant who deprived his companion animals of food intentionally chose not to help them and "intended the consequences of that omission").

¶ 43        Here, the jury heard the testimony of Lagerstam, Lisney, and Castelein describing Star and the other dogs found on the two properties as emaciated, skinny, and underweight, with protruding ribs, hips, and backbones. Additionally, the jury saw photographs of the dogs and could see for themselves the dogs' skeletal bodies. Further, the evidence presented at trial showed that defendant knew his conduct was improper. Lagerstam testified that defendant told her on two different occasions that he gave Star and Luna food and water on the morning of January 13, 2021. From these statements, it can be inferred that defendant knew he needed to provide Star food and water; however, Star's emaciated condition, death, and stomach contents showed that defendant did not feed Star on January 13, 2021, and for many days before that. See *Robards*, 2018 IL App (3d) 150832, ¶ 17. From this evidence, the jury could have reasonably determined that defendant knew the consequences of not feeding his dogs, including Star, and yet made the conscious decision not to feed them, establishing his intent.

¶ 44        Defendant argues that to satisfy its burden of proof, the State had to present evidence about how long Star was not adequately fed. However, the State need not present evidence regarding the length of time the conditions causing an animal's death existed to convict a defendant of aggravated cruelty to a companion animal. See *Robards*, 2018 IL App (3d) 150832, ¶ 16. The emaciated condition of a dog and the fact that the dog died from starvation are sufficient reasons for a jury to conclude that the dog was without food for some time. See *Robards*, 2018 IL App (3d) 150832, ¶ 17; see also *Lee*, 2015 IL App (1st) 132059, ¶ 56 (stating that the emaciated

- 12 -

condition of horses could lead a jury to conclude "conditions persisted over a very lengthy period of time"). Severe deprivation of food that causes an animal to be emaciated does "not happen on a particular day or moment but over an extended time." *Lee*, 2015 IL App (1st) 132059, ¶ 55. When a companion animal dies of starvation, it is not necessary for the State to prove exactly how long the defendant failed to adequately feed the animal. See *Robards*, 2018 IL App (3d) 150832, ¶¶ 16-17.

¶ 45          While there was no testimony about precisely how long Star was deprived of food, the evidence established that Star had not been adequately fed in a long time. Castelein described Star as "extremely emaciated." Castelein rated Star's body condition as a 1, the lowest number on a body condition scale. Both Lagerstam and Castelein noted that Star lacked fat on her body, and Lagerstam said she could see Star's ribs. Castelein explained that a starving dog loses fat first, and as starvation continues, the dog loses muscle. Castelein noted several areas of Star's body where muscle wastage had occurred, establishing that Star was deprived of adequate food for quite some time. Castelein found no evidence of any other illness or injury that could have caused or contributed to Star's untimely death at the age of one. Finally, Star's necropsy revealed the presence of only leaves and twigs and the complete absence of dog food in Star's stomach. This evidence was sufficient to establish that defendant failed to adequately feed Star for a lengthy period of time. See *Robards*, 2018 IL App (3d) 150832, ¶ 17; *Lee*, 2015 IL App (1st) 132059, ¶ 56.

¶ 46          The Third District's decision in *Robards* supports our decision to affirm the jury's verdict in this case. In *Robards*, the defendant was convicted of aggravated cruelty to a companion animal when her two dogs died of " 'dehydration and starvation' " after she left them in an uninhabited house with no water source or food. *Robards*, 2018 IL App (3d) 150832, ¶ 15. In affirming the defendant's conviction, the appellate court stated:

"The court could have inferred from the evidence presented that the defendant knew she needed to feed and water her dogs or they would die. [Citation.] The natural consequence of not feeding or providing water to pets is that they will die, particularly when they are locked in a house without outdoor access. As a person intends the natural and probable consequences of his acts [citation], it follows that the defendant had the requisite intent necessary to be found guilty of aggravated cruelty to a companion animal. Therefore, taking the evidence in the light most favorable to the State [citation], a rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Robards*, 2018 IL App (3d) 150832, ¶ 15.

¶ 47    Defendant contends that the Third District's decision in *Robards* is "clearly distinguishable" from this case because (1) the defendant in *Robards* was the only person caring for the dogs, while in this case Carla also lived at the property and could have fed Star; (2) the dogs in *Robards* did not have outdoor access, but Star did; (3) the dogs in *Robards* had no access to water, but defendant left a hose outside for Star; and (4) the dogs in *Robards* died of starvation and dehydration, while "Castelein never opined that Star had died of dehydration." We find none of these distinctions important.

¶ 48    First, there was sufficient evidence to show that defendant was the person responsible for caring for Star and, therefore, responsible for her death. Lagerstam testified that both times she spoke to defendant, he told her that Star was his dog and that he was responsible for providing her with food and water. In one of those conversations, defendant identified himself as Star's "caretaker." Thus, the evidence supported the jury's conclusion that defendant was responsible for Star's death. That defendant's wife, Carla, was also present at the property where

Star starved to death does not make defendant any less culpable. See *Land*, 2011 IL App (1st) 101048, ¶ 122 (affirming a dog owner's conviction for aggravated cruelty even though the owner delegated responsibility of the dog to her 12-year-old son). Sufficient evidence was provided at trial to support the jury's determination that defendant was responsible for Star's emaciated condition and death, as he was Star's owner and self-described "caretaker."

¶ 49    Next, defendant contends that the location of the starved animal matters in determining whether the defendant committed aggravated cruelty. We disagree. While the Third District found it significant that the dogs in *Robards* were left inside "without outdoor access," it is equally, if not more, significant that Star was left *outside* in January in the cold when there was snow on the ground. *Robards*, 2018 IL App (3d) 150832, ¶ 15. That Star was left outside, rather than inside, does not make it less probable that defendant was guilty of aggravated cruelty to her for failing to adequately feed her.

¶ 50    Additionally, defendant contends that Star had access to water, unlike the dogs in *Robards*. However, Lisney and Lagerstam testified to the contrary. Lisney denied seeing any water on the property, and while Lagerstam observed a "chewed up" hose in the backyard, she said the dogs could not obtain water from it. It was for the jury to resolve this dispute. See *Harris*, 2018 IL 121932, ¶ 26. The jury was not required to believe Carla's testimony that Star could obtain water from the hose. Moreover, Star's access to water is irrelevant because Castelein testified that Star died from a lack of food. That Star may have had access to water does not negate the fact that defendant failed to provide her sufficient food to survive.

¶ 51    Finally, that the dogs in *Robards* died of starvation and dehydration, while Star's cause of death was only starvation, is immaterial. Nothing in *Robards* suggests that the appellate court's judgment in that case would have been different if the dogs had died of starvation alone

and not dehydration as well. In fact, citing the aggravated cruelty statute, the court in *Robards* stated: "The evidence need only establish that the defendant intentionally committed *an act* that caused the death of a companion animal." (Emphasis added.) *Robards*, 2018 IL App (3d) 150832, ¶ 17 (citing 510 ILCS 70/3.02(a) (West 2014)). Proof that defendant caused a companion animal to starve to death is "an act" that sufficiently supports a conviction for aggravated cruelty.

¶ 52    Defendant also relies on the First District's decision in *Lee* as "instructive for the kind of evidence relied upon to infer specific intent and thus uphold a conviction for animal cruelty." In *Lee*, the defendant was convicted of aggravated cruelty when several emaciated horses with overgrown hooves were found on his property locked in very hot stalls filled with several feet of petrified manure. *Lee*, 2015 IL App (1st) 132059, ¶¶ 8-11, 46, 55-56. The First District upheld defendant's convictions, finding that a rational jury could find that defendant committed the essential elements of aggravated cruelty beyond a reasonable doubt. *Lee*, 2015 IL App (1st) 132059, ¶ 63.

¶ 53    The First District's decision in *Lee* also supports our decision in this case. Just like the defendant in *Lee*, who "caused the horses to suffer greatly by severe deprivation" (*Lee*, 2015 IL App (1st) 132059, ¶ 55), defendant caused Star to suffer greatly by severely depriving her of food. Indeed, Star's deprivation was even more severe than the horses in *Lee* because they were found alive, while Star was found dead from starvation. Thus, as in *Lee*, it was reasonable for the jury to conclude that defendant's conduct satisfied the essential elements of aggravated cruelty beyond a reasonable doubt. See *Lee*, 2015 IL App (1st) 132059, ¶ 63.

¶ 54    Defendant contends that the Fifth District's decision in *Kirkpatrick* "supports his position in the instant case." In *Kirkpatrick*, the Fifth District reversed a conviction for aggravated cruelty against an unlicensed veterinarian who operated on a dog under unsanitary conditions,

resulting in the dog's death. *Kirkpatrick*, 2020 IL App (5th) 160422, ¶¶ 16-17, 23, 26, 67. The court explained that reversal was required because "none of the evidence adduced at trial supported an inference that the defendant's conscious purpose or objective was to kill or seriously injure [the dog] when she operated on him in an unsterile manner." *Kirkpatrick*, 2020 IL App (5th) 160422, ¶¶ 62, 64. In reaching its decision, the court distinguished the defendant's isolated conduct from the defendants' conduct in other cases, like *Robards*, "where the defendant's specific intent could be inferred from a course of conduct occurring over an extended period of time." *Kirkpatrick*, 2020 IL App (5th) 160422, ¶ 66. Like the defendant in *Robards* and unlike the defendant in *Kirkpatrick*, in this case, defendant's specific intent to kill or injure Star could reasonably be inferred from defendant's failure to adequately feed Star over an extended period time. See *Kirkpatrick*, 2020 IL App (5th) 160422, ¶ 66; see also *People v. Banks*, 161 Ill. 2d 119, 133 (1994) (finding the defendant intentionally killed the victim, who died of starvation and hypothermia).

¶ 55        Finally, defendant takes issue with the fact that "no histopathology, or microscopic examination of the tissues was ever ordered." However, Castelein's testimony established that no histopathology was necessary. Castelein, a veterinary expert, testified that a histopathology is unduly expensive and only required if a necropsy shows that an animal may have died from an unknown cause, such as poison. Castelein testified that his necropsy did not lead him to conclude that Star died of a disease or poisoning, so there was no need to order a histopathology. Defendant presented no evidence or testimony to refute Castelein's opinion that a histopathology was unnecessary, nor did he present any evidence or testimony that Star's cause of death was anything other than starvation.

¶ 56        Based on the evidence presented at trial, a rational jury could reasonably conclude that the State proved the elements of aggravated cruelty to a companion animal beyond a

reasonable doubt.

¶ 57                                    III. CONCLUSION

¶ 58            For the reasons stated, we affirm the trial court's judgment.

¶ 59            Affirmed.